**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**LAM LEK CHONG, a/k/a Jimmy Lam et al., Defendants-Appellants.**

Nos. 875, 880, 933, Dockets 75–1435, 75–1440, 76–1005.

United States Court of Appeals, Second Circuit.

Argued April 12, 1976.

Decided Sept. 27, 1976.

Henry J. Boitel, New York City, for Chong.

Gilbert Rosenthal, New York City, for Chung.

Harold O. N. Frankel, New York City (Jerald Rosenthal, New York City, of counsel), for LiGanoza.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City (John W. Timbers, Asst. U. S. Atty., New York City, of counsel), for United States of America.

Before CLARK, Associate Justice,* and MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

These are appeals from judgments of conviction entered in the Southern District of New York following a four-week jury trial before Charles H. Tenney, Judge. Appellants Jimmy Lam, David Chan,[1] and Francisco LiGanoza were each convicted of conspiring to import and distribute heroin in violation of 21 U.S.C. § 846.[2] The principal claims or error raised upon the appeals are the not unfamiliar ones that the evidence presented at trial varied from the indictment by showing multiple conspiracies rather than the single conspiracy charged, and that the prosecutor's comments denied the defendants a fair trial. With respect to the

---

* Hon. Tom C. Clark, Associate Justice of the Supreme Court, Retired, sitting by designation.

1. "Jimmy Lam" and "David Chan" are the anglicized names of appellants Lam Lek Chong and Yuk Choi Chung respectively. We use the anglicized names to avoid confusion.

2. Count Two charged LiGanoza with violating 21 U.S.C. § 841 and 18 U.S.C. § 2 by distributing 1½ pounds of heroin involved in a delivery made in New York City on May 30, 1974. The jury was unable to reach a verdict on this count.

first claim we find that the proof established the conspiracy charged in the indictment against each of the appellants and they were not prejudiced by evidence of a second conspiracy or the court's failure to deliver a multiple-conspiracy charge. We find no merit in the claim of denial of a fair trial and no reversible error in the other points raised by appellants. Accordingly, we affirm the judgments of conviction.

## THE EVIDENCE

The government presented its case at trial primarily through the testimony of Herbert Wright and Frank Mingo, two New York City policemen who, posing as pimps, engaged in extensive drug negotiations with the appellants.[3] The tale begins on January 24, 1974, when Officer Mingo was introduced to Lam, the operator of a travel agency in Chinatown. Mingo expressed an interest in buying large quantities of heroin, and Lam quoted a price of $25,000 to $28,000 a pound. Lam also suggested that Mingo might be able to obtain the heroin cheaper through direct importation from Hong Kong, using either the mails or a courier. During the next several days, Officer Mingo negotiated for heroin with two persons introduced to him by Lam, who were described as Michael and Fatman. The pair, who were among those named as unindicted co-conspirators in this case, gave him a sample of heroin, and agreed to sell him a full pound for $28,000.

The sale was consummated in the early morning hours of January 30 in Manhattan. The sellers—Fatman, Michael, and Sonny (another unindicted co-conspirator)—insisted on selling the officers 1½ pounds of heroin instead of the pound previously agreed upon. Showing a trust perhaps unusual in the circumstances, the sellers delivered the additional half-pound on credit. That evening, Officer Mingo visited Lam and paid him the first $1,000 of the $14,000 due on the extra half-pound. During the

rest of February, the officers continued to pay off the debt, giving $10,000 of it to Sonny, and the remainder to Lam. They also resumed conversations with Lam about a direct importation from Hong Kong. After their discussions had focused on importing a full 100 pounds, Lam told them on February 22 that he had sent a man to Hong Kong to begin making the necessary arrangements there with the source of the heroin. The passport of LiGanoza, introduced at trial, showed he arrived in Hong Kong on February 24 and remained there through March 7.

As the negotiations for the Hong Kong importation progressed further Chan entered the scene and was introduced to the officers by Lam as a friend who owned an importing company which could be used as a cover for importation of the heroin. Chan, Lam, and the officers met on March 12 to discuss the modus operandi, which would be to put the heroin into cans of soybean sauce, reseal the cans, and ship them from Hong Kong to Chan's importing company in Virginia. To avoid a possible hijacking by their Hong Kong suppliers, Chan suggested that the heroin be delivered in a hotel room there without informing the sources that it would later be shipped to the United States. The mechanics of the transaction were further refined at a March 19 meeting of the four, where Chan again suggested a precautionary measure: shipping dummy cans containing only soybean sauce to the United States at the same time as the heroin-filled cans. Finally satisfied with the plan Chan said, in Chinese, "Tell him definitely I'll do it; definitely do it one time."

Chan left for Hong Kong in late March. Lam and LiGanoza went there in early April; they did not travel together. The officers also flew to Hong Kong, arriving on April 17. There ensued a series of haggling negotiations among Lam, Chan and the two officers. Lam demanded $10,000 to

---

**3.** Tape recordings of conversations between the officers and the defendants in this country were introduced into evidence. Conversations with the appellants in Hong Kong were not tape-recorded, because of difficulties with the equipment and questions involving the legality of such action under Hong Kong law.

$15,000 in advance from the officers to complete preparations for the shipment of the heroin; the officers, posing as cautious buyers, insisted on seeing the heroin before they paid any money. On April 22, Lam finally produced a cigarette package containing a sample of a brown rock substance which a "marquis reagent" test conducted by Detective Wright showed to be heroin.[4] Despite the production of this sample, however, progress in completing the transaction continued to be bogged down. Finally, on April 22, Lam called the officers with specific plans for a delivery: Detective Wright was to go to room 319 of the Sun Ya Hotel, meet a "Francisco Li" there and receive the heroin. Simultaneously in a separate room, Officer Mingo would pay the money. Later that day, however, Lam called with a demand from the heroin source for a $7,000 advance payment.

After Wright balked at the demand for the advance, Lam came to the officers' room, accompanied by LiGanoza whom the officers had not previously met. Lam introduced LiGanoza as the nephew of the heroin supplier and said that they had convinced the supplier to scale down his demanded advance payment to $5,000. Officer Wright said he would try to convince Johnny (the fictitious boss of the officers) to pay the $5,000. LiGanoza did not speak during the meeting. The advance payment was never made. The transaction fell through and all concerned, except Chan,[5] returned to the United States.

Undaunted by the collapse of the Hong Kong venture Lam, upon returning to the U.S., began negotiating with the officers to sell them more heroin. When discussions about another purchase through Sonny, Fatman and Michael fell through Lam turned to arranging another sale of heroin to be provided by LiGanoza. According to Lam, although LiGanoza's uncle, the ultimate supplier of the heroin which was to have been furnished in Hong Kong, was angry at the failure of the transaction

there, a sale might still be arranged. Lam advised that the uncle sometimes sent smaller packages through the mails to different addresses in the U.S. and from these addresses the heroin came to LiGanoza. During May, Lam continued discussing the possible purchase of one of these shipments with the officers.

While the officers did not meet LiGanoza in the course of these negotiations, on two occasions during their telephone conversations with Lam, the latter handed the phone to a man he identified as Francisco or Charlie Chan. This man then exchanged pleasantries with the officers and on one of the occasions confirmed Lam's previous statement that one of the links in the chain between the uncle and LiGanoza had gone to Boston to make arrangements for obtaining the heroin. These negotiations finally bore fruit on May 30 when Lam took Officer Mingo to LiGanoza's apartment. Opening the door with keys he possessed, Lam gave Mingo 1½ pounds of heroin stored in a garbage can in the kitchen of the apartment. Lam was arrested as he left the apartment, and LiGanoza was arrested as he stood alone on the street corner outside, facing the apartment building. Chan was later arrested.

Chan was the only defendant to testify at trial. The thrust of his testimony was that he had never agreed to help import heroin and had at most agreed to look into the idea. He further testified that he understood little of what transpired at meetings where he was present with Lam and the officers since the others talked mostly in English, which Chan claimed he did not understand very well. He also testified that Lam had sometimes misinterpreted what he said. LiGanoza introduced evidence to the effect that the purpose of his trip to Hong Kong in late February had been to get married. Lam called a New York City police detective to the stand, who testified that a wiretap on one of the telephones at Lam's travel agency in early

4. This substance was not itself introduced into evidence at the trial because Hong Kong law forbade its export from the country.

5. Chan apparently did not return to the United States until August 1974.

March had not disclosed any calls to Hong Kong or any drug-related conversations in English.

## DISCUSSION

### The Multiple Conspiracy Claim

Appellants argue that, although the indictment charged only one conspiracy limited to the Hong Kong venture, the proof presented by the government at trial represented a "bouillabaisse", which encompassed evidence not only of the Hong Kong venture but also of two other separate conspiracies involving respectively the January 30 and May 30 deliveries of heroin to the two undercover officers. This variance between indictment and proof, they contend, was fatally prejudicial.

 The threshold question is the scope of the conspiracy charged in the indictment, the relevant portions of which are set forth in the margin.[6] In arguing that the indictment charges only the Hong Kong venture appellants stress particularly the fact that all of the overt acts alleged involve only their activities during the Hong Kong venture, not those before it or after it. It has, however, long been held that a conspiracy indictment need not allege every overt act committed in furtherance of the conspiracy. *Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927). *See United States v. Cohen*, 518 F.2d 727, 733 (2d Cir.), *cert. denied*, 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *United States v. Koss*, 506 F.2d 1103, 1113 (2d Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975). Under the *Wong Tai* rule, this court has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). While the indictment in the present case is hardly a model of draftsmanship, it adequately charges a continuing conspiracy encompassing all three phases of the activities proved at trial, not merely the Hong Kong venture. Paragraph One alleges a conspiracy over a period which encompasses the dates of all three transactions, and which had New York as well as Hong Kong as its locale. The objective of the conspiracy was alleged to be not only the illegal importation of heroin, but also its distribution, a description of objectives which adequately covers the January 30 and May 30 deliveries. Indeed, the indictment states that it was only "a part of" the conspiracy to import the heroin from Hong Kong, again refuting appellants' contentions that the indictment must be taken to charge them only for their Hong Kong activities, rather than including also their drug dealings in New York. The indictment could have spelled out the alleged conspiracy in greater detail, but it was sufficient to enable the defendants to prepare a defense and protect themselves against double jeopardy. Moreover, the bill of particulars naming alleged co-conspirators and the government's pre-trial description of the alleged conspiracy in response to defense motions made it absolutely clear that the prosecutor planned to produce evidence concern-

---

**6.** Count One of the indictment reads as follows:

The Grand Jury charges:

(1) From on or about the 1st day of January, 1974 and continuously thereafter up to and including the date of the filing of this indictment, in the Southern District of New York,

Lam Lek Chong, a/k/a Jimmy Lam,

Yuk Choi Chung, a/k/a David Chan, and Francisco Li,

the defendants, and others to the Grand Jury unknown, unlawfully, intentionally and knowingly combined, conspired, confederated and agreed together and with each other to violate Sections 812, 841(a)(1),

841(b)(1)(A), 951(a)(1), 952(a), 960(a)(1) and 960(b)(1) of Title 21, United States Code.

(2) It was part of said conspiracy that the said defendants unlawfully, intentionally and knowingly would import into the United States from a place outside thereof, to wit, Hong Kong, large quantities of heroin, a Schedule I narcotic drug controlled substance, the exact amounts thereof being to the Grand Jury unknown, and to distribute, and possess with intent to distribute, said heroin within the United States, in violation of Sections 812, 841(a)(1), 841(b)(1)(A), 951(a)(1), 952(a), 960(a)(1) and 960(b)(1) of Title 21, United States Code.

ing all three transactions. *Cf. United States v. Fortunato*, 402 F.2d 79, 82 (2d Cir. 1968), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

Our conclusion that the indictment charges a single conspiracy encompassing not only the Hong Kong trip, but also the January 30 and May 30 dealings, brings us to the more troublesome question of whether the government proved such a conspiracy at trial. The appellants charge that the January 30, Hong Kong, and May 30 transactions were each part of a separate conspiracy, while the government rejoins that the proof establishes Lam as the centerpiece or "middleman" in a single, far-flung narcotics conspiracy composed of at least two groups of suppliers: (1) the Sonny-Fatman-Michael trio, and (2) LiGanoza and his associates. In determining whether the proof established multiple conspiracies rather than the single conspiracy charged, a distinction must be drawn between the events surrounding the January 30 heroin sale, on the one hand, and the Hong Kong and May 30 transactions on the other. The evidence supported a finding that the latter two transactions were part of the same conspiracy. The heroin delivered on May 30 came from the same source in Hong Kong (LiGanoza's uncle), and thereafter was routed along essentially the same chain of conspirators, running through LiGanoza and

then Lam to the same ultimate purchasers, Mingo and Wright. Indeed, the May 30 sale evolved as a partial substitute for the transaction which had fallen through in Hong Kong, and even the method of the May 30 delivery (transfer in a room associated with LiGanoza) was similar to that planned for Hong Kong. That the conspirators failed to achieve their objective in Hong Kong while they succeeded on May 30 cannot change the fact that both transactions appear to have been the work of the same conspiracy.[7]

■ Contrary to LiGanoza's claim, there was adequate nonhearsay evidence connecting him with this conspiracy to allow the trial judge to find, by a preponderance of the evidence, that he was a member of the conspiracy, *see United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and to admit Lam's out-of-court declarations implicating him under the co-conspirator exception to the hearsay rules. Fed.R.Ev. 801(d)(2)(E). First there was the evidence of LiGanoza's travels to and from Hong Kong. He ventured there in late February when Lam and the officers were planning the Hong Kong importation. After returning to the U.S., he next traveled to Hong Kong on April 12, arriving there only shortly before Lam. LiGanoza re-

---

*OVERT ACTS*

In pursuance of the said conspiracy and to effect the objects thereof, the following overt acts were committed in the Southern District of New York and elsewhere:

(1) On or about February 14, 1974, defendant Lam Lek Chong, a/k/a/ Jimmy Lam, had a meeting with two other persons at The New York Hilton Hotel, 1335 Avenue of the Americas, Manhattan, and negotiated for the importation and sale of heroin from Hong Kong.

(2) On or about March 12, 1974 defendant Lam Lek Chong, a/k/a/ Jimmy Lam, introduced defendant Yuk Choi Chung, a/k/a/ David Chan, to two other persons at the City Squire Motor Inn, 790 Seventh Avenue, Manhattan, and discussed with them the manner of importing heroin into the United States from Hong Kong.

(3) During March and April, 1974, defendants Lam Lek Chong, a/k/a/ Jimmy Lam,

Yuk Choi Chung, a/k/a/ David Chan, and Francisco Li traveled from New York City to Hong Kong.

(4) On or about April 21, 1974, defendant Lam Lek Chong, a/k/a/ Jimmy Lam, delivered a sample of heroin to two persons at the Hyatt Regency Hotel in Hong Kong.

(5) On or about April 22, 1974 defendants Lam Lek Chong, a/k/a/ Jimmy Lam, and Francisco Li went to the Hyatt Regency Hotel in Hong Kong and made arrangements to deliver heroin.

(Title 21, United States Code, Sections 846 and 963.)

7. Our conclusion that the conspiracy charged encompassed the May 30 transaction disposes of the arguments that Count Two, charging LiGanoza with substantive involvement in that transaction, was improperly joined in the indictment, *see* Fed.R.Crim.P. 8(b), or that the joinder gave rise to prejudice requiring a severance under Fed.R.Crim.P. 14.

mained in Hong Kong during the period when the final negotiations for that importation were underway, and left only three days after the deal fell through. Even if we disregard the government's suggestion that LiGanoza, by his silence, adopted Lam's statements implicating him on the occasion of their April 22 meeting with the officers in the Hong Kong hotel room,[8] his presence at the meeting, resulting from a trip made halfway around the world at considerable expense, is itself evidence of membership in the conspiracy; certainly it is far removed from the casual association with conspirators of the type which we have found insufficient to raise such an inference. *See, e. g., United States v. Fantuzzi*, 463 F.2d 683, 689–90 (2d Cir. 1972).

The next evidence concerns LiGanoza's part in the May 30 heroin delivery. The heroin was stored in LiGanoza's apartment, and the latter was arrested shortly after the delivery, standing in the street outside. It is conceivable that the drugs were, as LiGanoza suggests, stored in his apartment by Lam without his knowledge, but the court and jury were entitled to reject this explanation after taking into account the value of the heroin ($40,000) and that, being stored in a garbage can in the apartment, it might have been thrown out at any time by LiGanoza if he had not been aware of its presence. Thus, although no particular piece of evidence, standing by itself, might suffice to implicate LiGanoza in the conspiracy, the combination, as in *United States v. Torres*, 519 F.2d 723, 726 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975), was sufficient to establish by a preponderance of the evidence that he "was aware of the scheme and participated in it." *See United States v. Tramunti*, 513 F.2d 1087, 1108–09 (2d Cir.), *cert.*

*denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Geaney, supra*, 417 F.2d at 1121. There being sufficient nonhearsay evidence of LiGanoza's implication to permit the trial judge to find by a preponderance of the evidence that he was a member, Lam's out-of-court statements made in furtherance of the conspiracy, which firmly incriminate LiGanoza, were properly admitted against him.

■ While the proof thus demonstrates that all three appellants were members of a conspiracy encompassing the Hong Kong and May 30 transactions, the January 30 delivery of heroin is not so easily viewed as part of the conspiracy. Although Lam also arranged that sale, the other participants were different; the heroin was supplied by the trio of unindicted co-conspirators—Sonny, Fatman, and Michael—rather than by LiGanoza and his associates. Since there is no evidence of any direct contacts or dealings between the two groups of suppliers, or that members of one group knew of the existence of the other, we are faced once again with the vexing problem of determining when such parallel groups of suppliers operating through a central figure can justifiably be found to be members of one single conspiracy, rather than of two or more separate conspiracies. Applying the basic principle that persons may conspire together without knowing the identity of all of their co-conspirators, we have found supplier groups to be part of one overall conspiracy when the scale of their operations was such as to justify the inference that each supplier knew that he was providing only a part of the total contraband supply, and to support the conclusion that he had agreed to maintain "a close relationship with a solvent, on-going apparatus." *United States v. Bynum*, 485 F.2d 490, 497

---

**8.** The government's argument on this point rests on the fact that LiGanoza was present at the time of the statements, and did not protest them. Judge Friendly's recent opinion in *United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir. 1976), persuasively condemns the tendency to reduce the doctrine of adoptive admissions to such an automatic "working rule" and notes that a proper application of the principle requires that the circumstances surrounding the statement be such that, if the statement were not true, a protest would be voiced. *See* 4 J. Wigmore, Evidence § 1071, at 102 (Chadbourne rev. 1972). Here, although there was sufficient independent evidence to support the trial judge's finding by a preponderance of the evidence that LiGanoza was a member of the conspiracy, *see United States v. Geaney, supra*, we cannot agree that he specifically acquiesced in Lam's statements at the April 22 meeting.

(2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). *See, e. g., United States v. Sperling*, 506 F.2d 1323, 1340 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *United States v. Ortega-Alvarez*, 506 F.2d 455, 457 (2d Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975). However, the inference depends largely on the scale of operations proven; the supplier who sells a relatively small amount of narcotics to another dealer may have, without more, no reason to suspect that the dealer is engaged in similar, extensive operations with others, and thus the evidentiary basis from which an overall conspiratorial agreement encompassing all suppliers might be inferred is lacking. *See United States v. Miley*, 513 F.2d 1191, 1207 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975).

The scale of operations of Lam and his suppliers falls short of that proven in leading cases such as *United States v. Bynum, supra*, and *United States v. Sperling, supra*. Here, aside from samples and the attempt to buy 100 pounds of heroin in Hong Kong, the only proven sales of heroin were two 1½ pound deliveries, one from each group of suppliers. This paucity of proof of a large-scale transaction or of interrelationship between smaller transactions tends to support appellants' claim that the January 30 dealings represented the work of a different conspiracy with different suppliers. *Compare United States v. Miley, supra*, 513 F.2d at 1206–07.

■ Admission of evidence of a separate January conspiracy, however, would not call for reversal in the absence of a showing that the error affected the "substantial rights" of the accused. *See* F.R.Crim.P. 52(a); *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Miley, supra*, 513 F.2d at 1207, and cases there cited. The record in this case convincingly demonstrates that any variance stemming from proof of the Janu-

ary 30 dealings did not prejudice the appellants. No out-of-court statements by the unindicted January 30th co-conspirators implicating the appellants were admitted into evidence on the theory that all were part of a single conspiracy. Nor did the district judge give a *Pinkerton* charge, *see Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which might have permitted the jury to find the appellants guilty of a substantive offense committed by one of the unindicted January co-conspirators on the theory that their act was committed in furtherance of a conspiracy in which appellants were members. Rather, the only possible source of prejudice to appellants was the possibility that the evidence relating to the January 30 activities on Sonny, Fatman and Michael tainted the trial of appellants by transferring guilt from members of that conspiracy to them. *See Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Bertolotti*, 529 F.2d 149, 156 (2d Cir. 1975); *United States v. Miley, supra*, 513 F.2d at 1209.

■ In deciding whether such a "spillover" effect might exist a helpful starting point is to determine whether the number of conspiracies proven and conspirators tried was so large as to make it difficult for the jury to weigh the evidence against each defendant carefully and intelligently. *See United States v. Bertolotti, supra*, 529 F.2d at 156. Here, only three defendants were on trial, and the total cast of characters, including Sonny, Fatman and Michael and several other unindicted co-conspirators, numbered only nine.[9] At most, two conspiracies were proven. This simply-structured case thus stands in sharp contrast to those which have found a possible "spillover" effect because the number of conspiracies and conspirators were too great for the jury's intelligent differentiation. *Compare Kotteakos v. United States, supra*, (prosecution of 36 persons involved in eight separate conspiracies); *United States v.*

---

**9.** The other co-conspirators—e. g., LiGanoza's uncle—were participants in the later conspiracy with the appellants.

*Bertolotti, supra,* (17 defendants on trial; at least four conspiracies). Indeed, even in *United States v. Miley, supra,* where the numbers of conspiracies and conspirators involved were somewhat greater than in the present case, we found them insufficient to presume that the defendants had been swept away in such vortex of guilt by association. *See, also, Berger v. United States, supra.*

The record in this case, furthermore, confirms the lack of prejudice to appellants. The overwhelming bulk of the trial testimony was directed toward proof of the conspiracy involving the Hong Kong venture and the May 30 sale, with evidence concerning the January 30 dealings amounting to no more than 30 pages of a trial transcript of more than 1800 pages. The transaction with Sonny, Fatman, and Michael was simply and briefly described by the officers as background for their testimony concerning their later dealings with Lam. The government barely touched upon Sonny, Fatman and Michael in its summation. Thus appellants were not "subjected to a deluge of evidence relating to [the conspiracy] in which they played no role," *United States v. Bertolotti, supra,* 529 F.2d at 157. *See United States v. Miley, supra,* 513 F.2d at 1209. On the contrary the trial evidence focused almost entirely on the conspiracy of which they were members, and there is no reason to believe that the jury convicted them through transference of guilt from the activities of Sonny, Fatman, and Michael, rather than on the basis of this evidence.

 This conclusion is reinforced by the strong evidence of appellants' participation in the later conspiracy. Lam, of course, was so deeply implicated in both the January 30 dealings and the later conspiracy that any variance would, without doubt, be harmless as to him. *Cf. United States v. Sir Kue Chin,* 534 F.2d 1032, 1035 (2d Cir. 1976). Indeed, as to him the evidence of his arrangement of the January 30th sale was admissible to show later guilty knowledge and intent, particularly in view of his defense of entrapment. *See United States v. Papadakis,* 510 F.2d 287, 294 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

The evidence against Chan is also powerful; his active participation in the planning of the Hong Kong venture was well established, and there was no evidence that he withdrew from the conspiracy after the collapse of that particular phase of its operations. We have already outlined the non-hearsay proof of LiGanoza's participation as a supplier in the Hong Kong—May 30th conspiracy, and we fail to find that the court admitted any hearsay declarations on the part of the unindicted participants in the January 30th transaction (i. e., Sonny, Fatman and Michael) which tended to incriminate LiGanoza. On the contrary, the hearsay implicating LiGanoza came from Lam, a member of the later conspiracy, not from a person who participated only in the pre-Hong Kong transactions. Thus, even assuming a variance, the hearsay implicating LiGanoza was properly admitted. When this evidence is considered along with the non-hearsay evidence implicating LiGanoza in the conspiracy, proof of his participation is convincing; he stands as the crucial link between the ultimate suppliers of the heroin and Lam, the immediate distributor. In sum, the amount of evidence adduced regarding all three appellants' participation in the conspiracy encompassing the Hong Kong and May 30 transactions makes it implausible that the jury convicted them on the basis of a "spill-over" of the activities of the earlier conspiracy.

 Appellants insist nonetheless that the trial judge's failure to include specific instructions regarding multiple conspiracies in the charge to the jury compounded the possibility of prejudice from the admission of proof of the January 30th transaction. The charge requested is, however,[10] precise-

---

**10.** The charge requested reads as follows:

"Considering the government's proof, you must ascertain whether there was a single continuing overall conspiracy or separate independent conspiracies with separate and disparate groups involved with no overall

ly the one long ago condemned in *United States v. Kelly,* 349 F.2d 720, 757–58 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), because it tends to pressure a jury into finding all defendants guilty in order to avoid having to acquit a defendant who is clearly involved in all conspiracies, thus tending to prejudice peripheral defendants who might otherwise be acquitted. *See id.; United States v. Bynum, supra,* 485 F.2d at 497. As Judge Friendly recently noted in *United States v. Leonard,* 524 F.2d 1076, 1084 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), a requested charge "must be accurate in every respect" before a trial judge is held in error for refusing it. This is especially so in a case such as this where the law in the area is complicated and full of pitfalls for even an experienced trial judge; he is entitled to an accurate statement of the law in the requested charge, not an erroneous statement of it. Despite some language in certain of our decisions, e. g. *United States v. Calabro,* 449 F.2d 885, 894 (2d Cir. 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972), it is clear that conspiracy defendants are not entitled to a charge requiring acquittal if the jury finds multiple conspiracies, at least where, as here, one of the conspiracies proven is the one charged in the indictment. *See United States v. Tramunti, supra,* 513 F.2d at 1107–08.

■ Here, as in *Tramunti,* the charge given stressed that the jury must find the conspiracy charged in the indictment (i. e., one in which appellants were agreed upon one or more of the objectives charged, which were the importation, distribution and possession of narcotics with intent to distribute) and that to convict a particular defendant the jury must view the evidence

> central purpose. Therefore, if you find separate conspiracies and that some other defendant belongs to one and not to the other, then there would be no proof of a single conspiracy charged in the first count of the indictment, and you should, therefore, return a verdict of not guilty as to all defendants under the conspiracy count."

separately as against him, and find that he was a member. Although a multiple conspiracy charge of the type given in *Tramunti* might have been helpful to the jury, the absence of such a charge in this relatively uncomplicated case can hardly be labelled plain error. Viewing the instruction as a whole, as we must, *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *United States v. Nadler,* 353 F.2d 570, 572–73 (2d Cir. 1965), we cannot find that they worked any prejudice upon the appellants.[11]

## Cross Examination and Comments by the Prosecutor

Appellants next seek reversal and a new trial on the ground that various lines of questioning and comments during trial by the Assistant United States Attorney who prosecuted the case amounted to prosecutorial misconduct and prejudicial error, which had the effect of denying them a fair trial. Turning to the government's cross-examination of Chan, which provides the source of some of appellants' more serious claims, the prosecutor first ran into troubled waters when he asked Chan a question apparently designed to elicit the fact that, after his arrest, Chan had made a statement implicating himself and Lam in the conspiracy. The trial judge sustained an objection by Lam's counsel on the ground that the statement was inadmissible against Lam because it was made after the termination of the conspiracy. Although the prosecutor apparently initially understood the ruling, after a luncheon recess he began a similar line of questioning. After a renewed objection and a side-bar conference at which the trial judge reiterated his ruling, the prosecutor ceased his efforts and shifted his questioning to other matters, thus avoiding the problem.

11. We regard as frivolous Lam's argument that the charge left the incorrect impression that the defendants could be convicted even if the only conspiracy found was one to defraud the agents. The charge clearly required the jury to find a conspiracy to import and distribute heroin in order to convict.

Lam's objection to the questioning appears to have been well-founded. While the hearsay was admissible against Chan as an admission, *see* Fed.R.Ev. 801(d)(2)(A); *United States v. Matlock,* 415 U.S. 164, 172, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); C. McCormick, Evidence § 262 (2d ed. 1972); 4 J. Wigmore, Evidence § 1048 (J. Chadbourne rev. 1972), it was not admissible against Lam, since it was made after Chan's arrest, and consequently the co-conspirator exception to the hearsay exclusion was no longer available to permit the statement's use against Lam. *See* Fed.R.Ev. 801(d)(2)(E); *Wong Sun v. United States,* 371 U.S. 471, 490, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); McCormick, *supra,* § 267 at 645–46. Contrary to the government's argument, *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), does not authorize use of the statement against Lam; as applied, its holding is simply that Lam's rights under the Confrontation Clause would not have been violated had Chan's statement been admitted with instructions limiting it to use against Chan.

Equally clear, however, is the fact that no reversible error arose from this contretemps. Had the prosecutor prefaced his questioning with a request that the trial judge instruct the jury to consider the answers only as against Chan, the rules of evidence would not have barred use of the answer for this purpose. *See Wong Sun v. United States, supra,* 371 U.S. at 490, 83 S.Ct. 407. *See also Nelson v. O'Neil, supra,* 402 U.S. at 626–627, 91 S.Ct. 1723. *But see Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, *J.* concurring). Here, Lam actually received even more protection than such instructions would have given him, since Chan never answered the questions seeking to elicit the fact that he had made such a statement, and the trial judge ended the whole episode with firm instructions to disregard the entire line of questioning.

Appellants next complain that another question during the cross-examination of Chan was based on a post-arrest statement, a copy of which was never turned over to his defense counsel as required by Fed.R.Crim.P. 16(a)(1)(A). The statement was made by Chan on August 24, 1974, in the course of an interview with agent John Gartland of the Drug Enforcement Administration. Among other things, Chan apparently told the agent that Lam had said that a person named Han Ng was his source of heroin in Hong Kong. Agent Gartland made a written record of this oral statement. There is no evidence that the failure to turn over a copy of this record to counsel was anything but an inadvertent mistake; the prosecutor began his questioning of Chan on this point under the mistaken impression that the statement had been included in a mass of material provided to defense counsel and, upon learning that it had not been, he withdrew the question. Assuming that, as our dictum in *United States v. Johnson,* 525 F.2d 999 (2d Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976), indicates, this written copy of an oral statement falls within the scope of Rule 16, the question based on it was at most harmless error; indeed, in his brief Chan, the only party entitled to the statement, barely mentions the point in passing, and for a readily apparent reason. On the day after the interview with Agent Gartland, Chan had a similar interview with an Assistant United States Attorney, and made statements similar in all essential respects. A copy of the record of this interview was concededly turned over to Chan's counsel. The similarity between the two statements, insofar as they concerned Chan, makes it impossible for him to argue that the failure to turn over the copy of his interview with Agent Gartland affected his decision to testify at the trial. *See United States v. Johnson, supra,* 525 F.2d at 1004–05. This lack of impact on Chan, even aside from the fact that the question objected to was never answered, makes it impossible to view the error, if any, as prejudicial.

Still another question during the cross-examination of Chan is challenged on the ground that the statement on which it was based was taken from Chan in violation of

his right to counsel, as interpreted in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Judge Tenney held an evidentiary hearing after the trial, to determine the circumstances under which this statement was made, and rejected the claim that it was taken in violation of Chan's Sixth Amendment rights. This conclusion is supported by the evidence presented at the hearing, where Chan rested this claim on the fact that at the time of his arraignment his attorney had pulled him away from Agent Gartland and may also have told the Agent not to talk to Chan. Several days after the arraignment, however, Chan followed up on a previously-expressed willingness to cooperate with the government in other investigations by initiating a phone call to Agent Gartland, according to the latter's testimony at the hearing. A series of meetings then followed, at which Chan and the agents discussed these other investigations. Despite the fact that, according to Agent Gartland's testimony, the agents warned Chan not to tell them anything about the present case, during the course of one of these meetings he let slip the statement which served as the basis for the question.

 Judge Tenney apparently found no reason to doubt the credibility of Agent Gartland's testimony and neither do we.[12] Accepting this testimony, Chan's claim is patently without foundation. He was neither surreptitiously questioned by a bugged informant, as the case in *Massiah v. United States, supra,* nor subjected to any other interrogation during which his expressed wish for counsel was denied, *see, e. g., Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *cf. Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Rather, he freely volunteered the statement at one of a series of meetings which he initiated, and at which he had expressed no desire to have counsel.

The government was thus free to make use of the statement at trial. *See, e. g., United States v. Jeffers,* 520 F.2d 1256, 1269 & n.19 (7th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976); *United States v. Gaynor,* 472 F.2d 899 (2d Cir. 1973).[13]

 On the basis of excerpts of other statements made by the prosecutor during the four-week trial, which for the most part have been lifted out of context, appellants next argue that the overall effect was to violate their rights to a fair trial. We disagree. Although a few of the comments might better have been left unsaid, (e. g., the prosecutor's effort to caution the jury that it should not speculate as to why Lam was not named in Count Two), it is unrealistic to expect a model of total forbearance during a heated, multi-defendant trial. After reviewing each of the prosecutor's comments, questions and statements challenged by appellants, we are satisfied his trial conduct does not even vaguely approach the pattern of prosecutorial misconduct which has led us to order new trials in cases such as *United States v. Drummond,* 481 F.2d 62 (2d Cir. 1973). We find no impropriety, for instance, in his pointing out that the government proposed to introduce what it conceived to be a representative sample of some 150 recorded conversations and that it had made the balance available to the defendants for playing to the jury if they wished. This statement did not impinge upon the defendants' right to remain silent, since the omitted tapes could be—and indeed some apparently were—played without the defendants having to testify in their own defense. Moreover, when appellants' vigilant counsel objected to the various comments in question at trial, Judge Tenney promptly issued appropriate and strong corrective instructions to the jury. We do not, of course, imply that such instruction would suffice were the record to show a

---

12. Even Chan's testimony at this suppression hearing did not flatly contradict the thrust of Agent Gartland's testimony.

13. Chan's additional claim that the government violated its duties under Fed.R.Crim.P. 16 with regard to this statement is without merit. No written copy was made of this statement, and Chan's counsel was informed of its existence as soon as the prosecutor learned of it, some two weeks before Chan took the stand.

consistent pattern of prejudicial conduct by the prosecutor, *cf. Krulewitch v. United States, supra,* 336 U.S. at 453, 69 S.Ct. 716 (Jackson, *J.* concurring). But viewing the record as a whole, as we must, *see United States v. White,* 486 F.2d 204, 206–07 (2d Cir. 1973), *cert. denied,* 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974), we see no reason to believe that in this case such instructions were not sufficient to ward off any prejudice resulting from scattered comments by the prosecutor in the course of a four week trial.

*Other Claims of Error*

No purpose would be served by extended discussions of the remaining claims of error, which clearly are meritless. The Fourth Amendment did not bar the use at trial of the recordings of various conversations between Lam and Chan in Chinese. The undercover agents were present at these conversations, which took place in the agents' hotel rooms; Lam and Chan assumed the risk that the agents could speak Chinese or had with them a recorder to tape the conversations for later translation. *Cf. Lopez v. United States,* 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. Kaufer,* 406 F.2d 550, 551–52 (2d Cir.), *aff'd mem.,* 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414, *rehearing denied,* 395 U.S. 917, 89 S.Ct. 1741, 23 L.Ed.2d 232 (1969). The questions concerning the possible unreliability of the marquis reagent test, which showed that the cigarette package delivered in Hong Kong contained heroin, were for the jury's consideration in determining the weight to give to this evidence;[14] they did not bar introduction of the results of the test. *See United States v. Bermudez,* 526 F.2d 89, 97–98 (2d Cir. 1975); *United States v. Kelly,* 420 F.2d 26, 28 (2d Cir. 1969). The trial judge committed no error in sending to the jury during its deliberations a copy of the transcripts of the various recorded conversations for a limited purpose. *United States v. Carson,* 464 F.2d 424, 436–37 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268,

34 L.Ed.2d 219 (1972); *United States v. Koska,* 443 F.2d 1167 (2d Cir.), *cert. denied,* 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). Finally, since the copies of telex communications reporting what Drug Enforcement Administration agents had been told by Hong Kong police about the defendants' activities in that city were clearly hearsay and not within any exception to the hearsay rules, they were properly excluded.

The judgments of conviction are affirmed.

---

**14.** Defense counsel engaged in vigorous cross-examination on this point, so the question of the reliability of the test was well-aired for the jury.