**UNITED STATES of America, Appellee,**

**v.**

**Frank VISERTO, Jr., Richard Rocco, Joseph Solce, Garnet Johnson, Sarah Payne, Howard Williams and Prentiss Covington, Defendants-Appellants.**

Nos. 476 to 482, Dockets 78–1281 to 78–1283, 78–1305 to 78–1308.

United States Court of Appeals, Second Circuit.

Argued Dec. 18, 1978.

Decided March 21, 1979.

---

Michael E. Tigar, Washington, D. C., for defendants-appellants Viserto, Rocco and Solce.

Jules Sack, Brooklyn, N. Y., for defendant-appellant Payne.

Lawrence Hochheiser, New York City (Donald E. Nawi, New York City, of counsel), for defendant-appellant Covington.

Gary R. Sunden, New York City, for defendant-appellant Williams.

Richard I. Rosenkranz, Brooklyn, N. Y., for defendant-appellant Johnson.

Gavin W. Scotti, Asst. U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., and Mary McGowan Davis, Asst. U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., of counsel), for appellee.

Before FEINBERG, MULLIGAN and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

The several appellants in this multi-defendant case appeal from judgments of conviction (Hon. Jacob Mishler, Chief Judge) entered after a jury trial for violations of the federal narcotics laws. After full consideration of the numerous arguments raised on appeal, we find them all to be without merit. Accordingly, we affirm.

I

The trial below involved ten defendants, seven of whom have appealed.[1] Count One charged all the defendants with conspiracy to distribute and to possess with intent to

---

1. The three defendants who are not parties to this appeal are Mary Keith, James Shell, and James Brodies. Chief Judge Mishler granted Keith's motion to dismiss Count One against her after the Government rested its case. Shell was acquitted, and the jury declared itself deadlocked as to Brodies. A mistrial was declared and the indictment was dismissed as to Brodies upon the Government's motion on July 21, 1978. Two other defendants, Charles Ford and Benny Thomas, entered guilty pleas prior to trial. The appellants are Frank Viserto, Jr., Richard Rocco, Joseph Solce, Garnet Johnson, Sarah Payne, Howard Williams, and Prentiss Covington.

distribute heroin in violation of 21 U.S.C. § 846 between January 1970 and September 1975. Counts Two and Three charged appellants Viserto, Rocco and Solce with distribution and possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Two charged possession of approximately 25 kilograms of heroin from January to June 1973; and Count Three alleged possession of approximately 50 kilograms of heroin from August to September 1973. Although none of the appellants directly challenges the sufficiency of the evidence, we shall summarize briefly the facts proved at trial.

The Government's case relied primarily on the testimony of two alleged co-conspirators, Charles Ford and Norman Alexander. The evidence, viewing it most favorably to the Government, showed the following. Ford testified that he met appellants Viserto and Rocco (and later Solce) in early 1970, and that he agreed to begin street distribution of heroin supplied to him by Viserto. Ford's operation proved successful. By September 1970 Ford had paid Viserto over $57,000 for heroin and was purchasing from him at a rate of ½ kilogram every 1½ months at a price of $10,000 per half-kilogram. During 1971 Ford's distribution network continued to grow, so that by 1972 he was purchasing between three and eight kilograms at a time from Viserto. Ford estimated that he paid Viserto approximately $1 million for the heroin he purchased during 1972.

The business continued through June 1973, at which time Ford testified that he attempted to bring his dealings with Viserto to an end. He was persuaded to continue, however, and in August or September 1973, after several meetings with Viserto and one with Rocco and Solce, Ford agreed to purchase 50 kilograms of heroin in a single shipment, at a cost of $25,000 per kilogram. This heroin was sold by Ford's distribution ring in Brooklyn, the Bronx, Manhattan, and Queens, New York. The heroin was apparently of poor quality, and for this or other reasons Ford fell behind in his payments to his principals. This occasioned a number of meetings with Viserto and Rocco in April or May 1975 at which Ford requested that he be given more heroin to sell in order to pay off his debt. At one meeting, Rocco informed Ford that he and Viserto had ways of collecting their money. Ford testified that by mid-1975 he had paid Viserto approximately $800,000 on the 50 kilogram shipment. He still owed approximately $250,000 when he ceased dealing with Viserto, Rocco, and Solce and left the New York area. Ford testified that, at one point, his lieutenants had asked him for guns. When he relayed that request to Viserto, Viserto supplied him with ten handguns, which Ford distributed to his confederates.

Norman Alexander testified that, after some occasional work during 1970 for two of Ford's lieutenants, Jeffrey Jones and Garnet Johnson, the promise of financial gain convinced him to work at selling heroin full-time. Alexander detailed the method of operations utilized by the drug ring and recounted dealings with Jones and Johnson, another lieutenant named Parks, and appellants Covington, Williams and Payne.[2] He testified that after April 1971, when Jones and Johnson were indicted for possession of heroin in the Supreme Court of Kings County, New York, he and Williams were promoted to fill their places as Ford's chief lieutenants. In that capacity Alexander often received instructions from Viserto, Rocco, or Solce regarding deliveries of heroin, and on several occasions he accompanied Ford to meetings with suppliers at which quantities of heroin were transferred.

The Government also introduced evidence to corroborate the testimony of Alexander and Ford. The admissibility of some of this

2. Johnson and Williams were implicated as partners or lieutenants of Ford who performed major roles in the conspiracy. Covington and Payne were more minor figures. Covington was at first a customer, then an occasional seller of small quantities of heroin received on consignment from Alexander, and finally a sub-lieutenant who worked for Johnson. Payne assisted the conspiracy by permitting storage of heroin shipments in her apartment.

evidence is challenged on appeal. (1) Against Viserto, Rocco, and Solce, the Government introduced evidence of substantial purchases for cash which they made in 1970–71. (2) Thomas Murray, an admitted drug dealer, was permitted to testify to two heroin transactions in which Viserto participated, and which occurred at about the same time as the alleged conspiracy. In addition, Police Officer Roger Garay of the New York Drug Enforcement Task Force testified to a conversation he *overheard* on October 6, 1977, between Viserto and Rocco, in which Rocco reportedly referred to a "customer" who had been purchasing for the last five years at a rate of "$25,000 a key" and who was, apparently, in trouble. (3) Finally, the Government introduced certified copies of the conviction of Jones and Johnson in New York Supreme Court as evidence that they possessed heroin during the period covered by the conspiracy indictment in Count One.

## II

### Evidence of Cash Transactions

 The admission of evidence that Viserto, Rocco, and Solce made substantial purchases for cash in 1970–71 was proper. The Government urged the inference that the use of cash showed that the defendants were engaged in an illegal business—the narcotics conspiracy—while the appellants contended that the cash came from the proceeds of a different illegal venture— gambling. We have held that proof of the availability of cash by defendants with no legitimate occupation is permitted as tending to show that it was derived from ill-gotten gains. *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Falley*, 489 F.2d 33, 38 (2d Cir. 1973); *United States v. Hinton*, 543 F.2d 1002, 1012–13 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), 1051, 97 S.Ct. 764, 50 L.Ed.2d 767, 1066, 97 S.Ct. 796, 50 L.Ed.2d 783, and 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

Proof of cash expenditures is not proof of "other crimes" as appellants suggest. It is relevant to the crime on trial. The suggestion that the cash may have come from another illicit activity goes only to the weight, not the admissibility, of the evidence. *United States v. Tramunti, supra.* The relevance is not so farfetched as to make its admission an abuse of discretion by the experienced trial judge. Chief Judge Mishler charged as follows:

There is testimony that the defendants Viserto, Rocco and Solce had large amounts of cash. You may infer from the existence of large amounts of cash that the large amounts of cash were proceeds or the results of illegal activities. The Government argues that the existence of large amounts of cash in this case shows that the defendants Viserto, Rocco and Solce were dealing in narcotics.

The defendants' position is that these large amounts of cash represent proceeds from gambling activities and the money lending business.

Since there was no affirmative evidence that the cash was derived from legitimate business, there was sufficient relevance to the crime charged for the consideration of the jury.

 Appellants contend that the acquittal of Solce for income-tax evasion, in the prosecution of which the same cash expenditures were in evidence, amounts to a collateral estoppel against the Government. In this case the prosecution was not bound by the outcome of the earlier prosecution, because the earlier acquittal of the income tax violation did not "necessarily" determine that the cash used was not derived from the narcotics business. *United States v. King*, 563 F.2d 559, 561 (2d Cir. 1977), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978); *United States v. Cala*, 521 F.2d 605, 608 (2d Cir. 1975).

 Appellants contend further that, since Solce had previously been acquitted of income-tax evasion, allegedly on the theory that the cash expenditures were from gambling activity which Solce believed to be non-taxable, the court should have admitted

in evidence the verdict of acquittal. A judgment of acquittal is relevant to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy or of collateral estoppel. But once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted. Not only does the inference appellants suggest not flow from the judgment of acquittal of Solce, but also a judgment of acquittal is hearsay. The Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal.

■ The further suggestion that the evidence *compelled* the defendants to urge that they were gamblers and that this therefore created a classic case of "confusion and waste of time," is not well-taken. The matter was well within the discretionary management of the trial judge.

### The Guns

■ The trial judge admitted testimony by Ford that when his lieutenants asked him to provide them with guns, he got handguns from Viserto which he distributed to his confederates. This was not error. We have recognized that handguns are tools of the narcotic trade, and that possible prejudice does not outweigh the relevance. The evidence was significant, if Ford was believed, in linking Viserto to the conspiracy and showing its scope. *See United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); *United States v. Grant*, 545 F.2d 1309, 1312–13 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977); *cf. United States v. Ravich*, 421 F.2d 1196, 1204–05 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). The judge gave a limiting instruction as well, reminding the jury that gun charges were not involved in this case.

### The "Other" Heroin Transactions

■ Police Officer Roger Garay was permitted to testify to two conversations he overheard, while in civilian clothes, on October 6, 1977. The first conversation Garay overheard as Viserto and a man later identified as Paul Caiano passed him on the street. Caiano told Viserto "we can't lose him as a customer, we have to make it up to him" and Viserto replied "All right, don't worry." The second conversation occurred between Viserto and Rocco in which Rocco referred to a "customer" who had been purchasing for the last five years at a rate of "25,000 a key" and who, apparently, was in trouble. Both conversations took place near a restaurant owned by Solce, in a neighborhood where Ford had testified he often met with his principals. The Government argued that the use of the word "key" —underworld argot for "kilogram"—indicated that the conversation between Viserto and Rocco related to drug dealings which had taken place during the period of the indictment. The conversation itself took place several days after the indictment when Garay undertook to conduct surveillance of the defendants with the hope of eavesdropping on their conversations. The argument that this related to an inadmissible "other crime" was not raised below and is, therefore, not available here. *United States v. Fuentes*, 563 F.2d 527, 531 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977).

Chief Judge Mishler cautioned the jury that Garay's testimony was admissible "only against Viserto and Rocco." Since the conversation may be read as coming within the scope of the conspiracy, it was properly allowed in evidence, in any event, as an admission by the particular defendants. Even if it were not strictly within the conspiracy charged, the conversation was admissible as a contemporaneous dealing in narcotics. Narcotics is a business, though an illegitimate one, and evidence that the defendants were in the business at a closely related time is relevant, and is not

**538**

a mere showing of bad character. Fed.R. Evid. 404(b). *See, e. g., United States v. Magnano*, 543 F.2d 431, 435 (2d Cir. 1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977); *United States v. Torres*, 519 F.2d 723, 727 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *United States v. Conley*, 523 F.2d 650, 652–54 (8th Cir.), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976). This rule supports the admission of Murray's testimony as well.

### III

#### Rule 16

 The only objection to the Garay eavesdropping made below was that the Government prejudiced the defendants by failing to provide pre-trial discovery of notes taken by Garay and by failing to provide pre-trial discovery of Officer Garay's testimony. Fed.R.Crim.P. 16(a)(1)(A) requires the Government, upon request, to permit inspection and/or copying of "any relevant written or recorded statements made by the defendant . . . within the possession, custody or control of the government," as well as "the substance of any oral statement . . . made by the defendant . . . *in response to interrogation* by any person then known to the defendant to be a government agent" (emphasis added). A non-recorded conversation *overheard* by a Government agent whose presence is not known does not come within the latter category. *United States v. Green*, 548 F.2d 1261, 1267 (6th Cir. 1977). The dictum in *United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974), cited by appellants, is inapplicable since it was made before the amendment of Rule 16, effective December 1, 1975. Since Garay made notes of the conversation on a newspaper, it might be argued, nevertheless, that appellants' statements were "recorded" within the first category of discoverable material covered by Rule 16(a). But because the statement was memorialized originally only in the recollection of a witness, it is not discoverable. *See United States v. Feinberg*, 502 F.2d 1180, 1182–83 (7th Cir. 1974),

*cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975). No written record was contemplated when the statement was made. *Id.* Garay's notes were nothing more than a hasty reminder to himself of what was said. In any event, there was no prejudice, since Garay's statement was made available to the defense on the eve of trial. *See United States v. Lam Lek Chong*, 544 F.2d 58, 69 (2d Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).

### IV

#### Duplicitous Counts

 Viserto, Rocco, and Solce contend that Counts Two and Three are duplicitous in that each count charges that the defendants both distributed heroin and possessed heroin with intent to distribute it, within the specified time periods. They argue that because of the alleged duplicity some jurors might have convicted appellants for distributing while others might have convicted for possession with intent to distribute, thus raising a question whether there was, in fact, a truly unanimous verdict on either.

Since the alleged duplicitous character of the counts appears on the face of the indictment, appellants could have moved before trial to dismiss the indictment. Fed.R. Crim.P. 12(b)(2). Failure to make the appropriate motion is a waiver. *United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977) (per curiam); *United States v. Rodriguez*, 556 F.2d 638, 641 (2d Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978); and *see generally Davis v. United States*, 411 U.S. 233, 243, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *United States v. Kelley*, 395 F.2d 727, 729–30 (2d Cir.), *cert. denied*, 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968). In any event, the statute, 21 U.S.C. § 841(a)(1), makes distribution and possession with intent to distribute a single offense. The indictment is in the standard form used to set out the means by which the single offense may be committed. That does not make the indictment duplici-

tous. *United States v. Astolas*, 487 F.2d 275, 280 (2d Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); *United States v. Lennon*, 246 F.2d 24, 27 (2d Cir.), *cert. denied*, 355 U.S. 836, 78 S.Ct. 60, 2 L.Ed.2d 48 (1957). And the propriety of this conjunctive pleading has been upheld precisely when the attack involved 21 U.S.C. § 841(a)(1). *United States v. Orzechowski*, 547 F.2d 978, 986–87 (7th Cir. 1976), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977); *United States v. Herbert*, 502 F.2d 890, 893–94 (10th Cir. 1974), *cert. denied*, 420 U.S. 931, 95 S.Ct. 1134, 43 L.Ed.2d 403 (1975).

In any case there could have been no confusion on the part of the jury because Chief Judge Mishler charged only the elements of possession with intent to distribute and did not charge at all the elements of "distributing." The argument about jury unanimity is accordingly unconvincing.

## V

### Supplemental Charge

■ The court's supplemental charge on constructive possession was given in response to a jury request for additional instructions. During the course of their deliberations, the jury delivered to the court a note which read: "We want to hear your charge on this Count [Two]. We would like to hear the law on circumstantial evidence in regard to the verdict so all jurors have this clear in their minds." After a colloquy with counsel concerning the meaning of this note, the trial judge decided that it was best to read it as a request to restate the essential elements of the crime, and to define the various terms in the charge. The Assistant United States Attorney suggested that a charge on actual and constructive possession, which had not been included in the original charge, would be appropriately included in the court's response. The judge determined to poll the jury concerning their desire for a definition of possession. One juror responded in the affirmative, and the judge gave the requested charge.

We find no improper or partial behavior in this. The supplemental charge which the court delivered was responsive to the jury's request. The definition of possession was correct. Considered as a whole, the supplemental charge was balanced and did not display any partiality to the Government's case. Though counsel might have requested a "mere presence" instruction if the defense had been informed in advance that a constructive possession charge was to be used, we cannot agree that "[t]he critical role of good argument was vitiated by the unrequested, unannounced and untimely instruction." Viserto Brief at 37. Counsel had vigorously argued the defense theory that Viserto, Rocco and Solce had only come into contact with Ford through gambling activities; and the prosecution had argued with equal vigor defendants' control over Ford's source of heroin. The charge on constructive possession thus in no way deviated from the path of trial that the parties had already pursued. *Cf. United States v. Martin*, 525 F.2d 703, 707 (2d Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975).

## VI

■ We come finally to the argument of appellants Covington and Payne that the District Court failed to follow the procedure established by Fed.R.Crim.P. 24(c) in dismissing alternate jurors. Rule 24(c) provides that a court may in its discretion direct that not more than six individuals "be called and impanelled to sit as alternate jurors." Alternates are to replace regular jurors "in the order in which they are called." The Rule further provides that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."

It is undisputed that this procedure was not followed below. Instead, sixteen jurors were impanelled, without any designation as regulars or alternates. Before the jury retired, defense and prosecution were given the opportunity in turn to select jurors to be discharged, until the requisite number of "regular" jurors remained. *All parties stip-*

*ulated to this procedure before trial* after a full explanation of the procedure by Chief Judge Mishler.

Apparently, this procedure is not uncommon in the Eastern District of New York. The supplemental appendix indicates that at least two of the judges in the District regularly employ this practice, but only if *all* counsel agree. This procedure was challenged but not disturbed in this court's *per curiam* decision in *United States v. Rauch*, 574 F.2d 706 (2d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 110, 58 L.Ed.2d 126 (1978). We did not, however, expressly consider the validity of the Eastern District practice. We think that the issue remains open and warrants comment.

More than a decade ago, we cautioned that "[t]he absence of benefit being so clear and the danger of prejudice so great, it seems foolhardy to depart from the command of Rule 24." *United States v. Hayutin*, 398 F.2d 944, 950 (2d Cir.), *cert. denied*, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968). That case involved the failure to discharge the alternate jurors "after the jury retires to consider its verdict." Rule 24(c). The convictions were affirmed since the court found no prejudice.

Here a benefit is asserted—that the jurors, not knowing who will be chosen, are more likely to stay awake during the trial. There is no empirical evidence that jurors clearly marked as alternates are less attentive than other jurors. Be that as it may, we commend the judges in the Eastern District who try to be innovative, but we caution again that Rule 24(c) represents a national consensus of bench and bar and ought not be disturbed on a local level.

It is true that the judges who use the method do so only when all counsel stipulate, but one can only speculate on the varying degrees of reticence of counsel to oppose the stated preference of the trial judge. Since we find no coercion or prejudice in the colloquy here and since the stipulation was signed by each defendant and by all counsel after extensive colloquy, there is no reason to upset these convictions. The failure to follow the rule strictly

has been waived. *See United States v. Baccari*, 489 F.2d 274 (10th Cir. 1973) (per curiam), *cert. denied*, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974). We should say, nevertheless, that we do not favor the amendment of the federal rules of criminal procedure by a general resort to stipulations. Consistency on jury selection, including the method of dismissing alternate jurors, throughout the federal court system, strikes us as desirable in the interest of stability and uniformity.

The procedure used in this case is worthy of consideration by the Federal Judicial Center and the Committees concerned with amendments to the Federal Rules of Criminal Procedure, but unless there is an amendment of Rule 24(c), we believe the Rule should be followed everywhere.

Appellants cite only one case allegedly in support of reversal in spite of a stipulation, *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975) (en banc), but that case concerned the substitution of an alternate juror after the original jury had already engaged in extensive deliberations. The court found that there had been no stipulation for the substitution of the alternate juror. It also held, alternatively, that even if an alternate is made a regular juror *after* deliberations have begun by stipulation, that would not cure the disregard of the mandatory rule. The substitution of an alternate after the jury deliberations have begun is different from our case.

We have considered the other arguments raised by the appellants and find them to be without merit. Accordingly, we affirm the convictions of all appellants.