

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-2002

# USA v. Gricco

Precedential or Non-Precedential:

Docket 0-2149

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Gricco" (2002). *2002 Decisions.* Paper 8.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/8

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 9, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2149 and 00-2179

UNITED STATES OF AMERICA

v.

ANTHONY J. GRICCO,

          Appellant in 00-2149

WILLIAM T. MCCARDELL

          William McCardell,
          Appellant in 00-2179

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court Nos. 99-cr-00202-1 and 99-cr-00202-2)
District Court Judge: Clarence C. Newcomer

Argued March 8, 2001

Before: ALITO and MCKEE and KRAVITCH,*
Circuit Judges

(Opinion Filed: January 9, 2002)

_____
* The Honorable Phyllis A. Kravitch, Senior Circuit Judge, United States
Court of Appeals for the Eleventh Circuit, sitting by designation.

F. Emmett Fitzpatrick (Argued)
926 Public Ledger Building
610 Chestnut Street
Philadelphia, PA 19106

 Counsel for Appellant
William T. McCardell (No. 00-2179)

Peter Goldberger (Argued)
Pamela A. Wilk, Esq.
50 Rittenhouse Place
Ardmore, PA 19003-2276

 Counsel for Appellant
Anthony J. Gricco (No. 00-2149)

Michael R. Stiles, U.S. Attorney
Walter S. Batty, Jr.
Louis D. Lappen (Argued)
Richard J. Zack (Argued)
Office of the United States Attorney
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106-4476

 Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

Appellants Anthony Gricco and Michael McCardell were convicted of conspiracy to defraud the United States, tax evasion, and making false tax returns. All of the charges related to the conspirators' failure to report on their personal income tax returns money that had been stolen from airport parking facilities. We affirm the appellants' convictions, but we vacate their sentences and remand for further sentencing proceedings and resentencing.

I.

From 1990 to 1994, Anthony Gricco was the regional manager for private companies that contracted with the Philadelphia Parking Authority to operate the parking

facilities at the Philadelphia International Airport. Gricco was responsible for the general operation of the facilities, including the hiring of employees and the collection of parking fees. Michael McCardell, Gricco's brother-in-law, was Gricco's chief assistant. McCardell oversaw the day-to-day activities of the tollbooths and picked up money from the cashiers at the end of their shifts.

The parking facilities at the airport used automated ticket machines as well as cashiers. Upon entering a lot, a customer would take a ticket from a machine. The date and time would be printed on the ticket and encoded in the magnetic strip on the back. To leave the lot, the customer would drive to a tollbooth and the ticket would be put into another machine. This machine would read the date and time of issuance, calculate the length of time that the customer had parked in the lot, and display the parking fee owed. The customer would then pay the cashier in the tollbooth. At the end of a shift, each cashier would bundle together the tickets and cash received and put them in a brown bag labeled with the cashier's name and the number of the tollbooth. Each cashier would also place in the bag a tape from the ticket-reading machine that provided a record of the tickets that the machine had processed. The supervisors then would forward the bags to Gricco's assistants.

In early 1990, Gricco, McCardell, and others made a plan to steal money by substituting customers' real tickets with replacement tickets showing false dates and times of entry. A customer who had parked in the lot for a long period of time would have a real ticket reflecting a high parking fee. On leaving the lot, the customer would pay this fee to the cashier. However, instead of inserting the real ticket into the ticket-reading machine, a cashier participating in the scheme would insert a replacement ticket, and the machine would calculate the parking fee based on the false date and time stamped on the replacement ticket. This replacement ticket would indicate that the customer had parked for only a short period of time, and thus the parking fee would be much lower. The thieves would pocket the difference between the amount paid by the customer and the amount of the fee shown on the replacement tickets.

3

Michael Flannery, a technician for the company responsible for maintaining the ticket machines, provided the replacement tickets. Flannery also disabled the fare displays on the ticket-reading machines so that customers could not see that the parking fees that they were paying were higher than the fees recorded by the machines.

Flannery initially supplied Gricco with replacement tickets by removing tickets from the ticket-issuing machines and then resetting the counters on those machines. In the beginning, Flannery obtained 30 tickets a day using this method, and one cashier, enlisted by Gricco, used the replacement tickets to steal cash. Gricco scheduled either McCardell or David Million, another supervisor, to oversee the tollbooth plaza at which this cashier worked. Gradually, more corrupt cashiers were enlisted, and eventually Flannery began printing counterfeit tickets.

Gricco, McCardell, Million, and Flannery expanded their scheme over the next four years. At first, Gricco enlisted cashiers who had engaged in a similar but smaller scheme in 1988. Eventually Gricco recruited about 15 other cashiers to participate. Flannery delivered the counterfeit tickets that he manufactured to Gricco, McCardell, or McCardell's wife. McCardell then distributed the replacement tickets to the corrupt cashiers, and at the end of their shifts, McCardell picked up the stolen money and forwarded it to Gricco, who distributed the money among the participants. The cashiers received a portion of the proceeds stolen during their shifts, and the rest was divided into four equal shares for Gricco, McCardell, Million, and Flannery.

The leading participants in the scheme did not report their unlawful income on their federal income tax returns. Gricco kept his money in a safe, loaned cash to others and received repayments in the form of checks or money orders, gave cash to family members, and placed real estate under his family members' names. Through a real estate broker named Ludwig Cappozi, Gricco purchased several properties for cash. Capozzi also engaged in real estate transactions with McCardell's wife, who used cash to

purchase properties under both her own and McCardell's name.

The cashiers involved in the scheme also failed to report their unlawful income on their income tax returns. They did not deposit their embezzled funds into banks for fear of being detected by the Internal Revenue Service. Gricco cautioned some cashiers not to put their money in banks, and he advised Flannery and Million to invest in real estate through Capozzi.

The scheme ended in September 1994, when the Philadelphia District Attorney's Office executed search warrants at the airport. In July 1996, the Commonwealth of Pennsylvania brought state charges of theft, forgery, and unlawful use of a computer against Gricco, McCardell, Flannery, Million, and numerous cashiers. The cashiers waived their right to a jury trial and were convicted in the Philadelphia Court of Common Pleas. After a three-day jury trial, Gricco, McCardell, and Million were acquitted, and the judge dismissed Flannery's case.

In April 1999, a federal grand jury returned an indictment against Gricco, McCardell, Million, and Flannery for conspiracy to defraud the United States by obstructing the lawful function of the Internal Revenue Service in the collection of federal income taxes, in violation of 18 U.S.C. S 371; tax evasion, in violation of 26 U.S.C.S 7201; and making false federal income tax returns, in violation of 26 U.S.C. S 7206(1). Prior to trial, Million and Flannery pleaded guilty and agreed to testify for the prosecution. Gricco and McCardell proceeded to trial.

The jury found Gricco and McCardell guilty on all counts. The government submitted a sentencing memorandum asserting that the total amount stolen between 1990 and 1994 was $3.4 million and that the tax loss was $952,000 (i.e., 28% of $3.4 million). The presentence reports adopted the conclusion that the tax loss was $952,000 and applied the base-offense level corresponding to that amount. Gricco and McCardell submitted written objections to these calculations, as well as to various other statements in the presentence report concerning their roles in the airport theft.

5

The district court held a sentencing hearing. The court first briefly paraphrased the parts of the presentence reports relating to the sentencing enhancements. The court gave Gricco and McCardell an opportunity to present evidence for sentencing purposes, but they declined and instead rested on their written submissions. The court then stated that it had read each party's arguments and would adopt the facts set out in the presentence reports.

The district court sentenced Gricco to 120 months of imprisonment and McCardell to 108 months of imprisonment. The court also sentenced each defendant to three years of supervised release, a $75,000 fine, and $700 in special assessments. Gricco and McCardell appealed.

II.

The appellants contend that their convictions for conspiracy are not supported by sufficient evidence. The appellants were convicted for a so-called "Klein" conspiracy[1] -- a conspiracy to defraud the United States by obstructing the lawful function of the Internal Revenue Service in assessing and collecting federal income taxes. See United States v. Shoup, 608 F.2d 950, 956 (3d Cir. 1979).

In order for a Klein conspiracy to exist, an agreed-upon objective must be to impede the IRS. Ingram v. United States, 360 U.S. 672, 679-80 (1959). This need not be the sole or even a major objective of the conspiracy. Id. In addition, impeding the IRS need not be an objective that is sought as an end in itself: an intent to hide unlawful income from the IRS in order to conceal an underlying crime is enough. See, e.g., United States v. Furkin, 119 F.3d 1276, 1280-81 (7th Cir. 1997). Moreover, in a Klein conspiracy case, as in other conspiracy prosecutions, the objectives of the conspiracy may sometimes be inferred from the conduct of the participants. See, e.g. , United States v. Applewhaite, 195 F.3d 679, 684 (3d Cir. 1999). In the end, however, the evidence must be sufficient to prove beyond a reasonable doubt that impeding the IRS was one of the conspiracy's objects and not merely a foreseeable

_____

1. See United States v. Klein, 247 F.2d 908 (2d Cir. 1957).

6

consequence or collateral effect. See United States v. Goldberg, 105 F.3d 770, 774 (1st Cir. 1997) ("[M]ere collateral effects of jointly agreed-to activity, even if generally foreseeable, are not mechanically to be treated as an object of the conspiracy.") United States v. Adkinson, 158 F.2d 1147, 1154 (11th Cir. 1998) (The government must "prove that there was an agreement whose purpose was to impede the IRS (the conspiracy), and that each defendant knowingly participated in that conspiracy."(emphasis omitted)). In determining whether the evidence is sufficient, we must of course view the proof in the light most favorable to the verdict and ask whether any rational jury could have found that the government met its burden. See, e.g., United States v. Frorup, 963 F.2d, 41, 42 (3d Cir. 1992). In this case, the government contends that the evidence is sufficient to meet this standard and relies chiefly on three categories of circumstantial proof.

First, the government relies on evidence that Gricco, McCardell, and other participants in the scheme did not report their illicit income. This evidence of parallel individual conduct has some probative value for present purposes, but it is plainly not enough by itself to show an agreed-upon objective to impede the IRS. It would not be at all surprising if all of these participants independently reached the conclusion that it would be best not to report their illicit income -- either because they feared attracting investigative attention or because they simply wanted to keep the money that they would have been required to pay in taxes if the extra income had been reported. Accordingly, the mere fact that participants in the scheme did not report the income in question cannot reasonably be viewed as giving rise to a strong inference that the participants agreed upon this course of action.

Second, the government points to evidence that Gricco and Capozzi, the real estate broker who assisted him in purchasing property, structured various financial transactions so as to avoid the filing of currency transaction reports.2 In addition, the government notes that

_____

2. Under 31 U.S.C. S 5313(a) and 31 C.F.R.S 103.22(b)(1), financial institutions must file a currency transaction report when they engage in a cash transaction in excess of $10,000.

7

on one occasion Gricco told Million never to "put any large sums of money in the bank, to be careful with that, especially anything over $10,000 because that would generate a report the bank would send to the IRS." Gov't Brief at 40. This proof has some probative significance for present purposes because Gricco's desire to avoid the filing of currency transaction reports could have stemmed from a fear that such reports would interfere with his plan to evade the payment of taxes on the illicit income. We recognize, however, that the value of this evidence is limited. The appellants were not convicted of conspiring to violate the anti-structuring statutes, see 31 U.S.C. S 5322-23, but with conspiring to obstruct the IRS in the assessment and collection of taxes, and structuring does not necessarily result in the evasion of taxes.

The government's best evidence against Gricco is testimony that he told various participants not to deposit their illicit income in a bank but instead to purchase safes for their homes. These individuals testified that they followed this advice because they did not want to attract the attention of the IRS. It is likely that a person who acquires illegal cash and places that cash in a home safe, rather than a bank, will not report the cash as income on his or her tax returns. Accordingly, a rational jury could infer that Gricco knew that the participants to whom he gave this advice would, in all likelihood, not pay tax on their illicit income.

The difficult question is whether a rational jury could go further and find that Gricco not only foresaw that this would occur but actually intended for it to occur. Although the question is close, we conclude that the evidence, viewed as a whole, could persuade a rational jury to make such a finding. A rational jury could conclude that, if participants in the embezzlement scheme had reported their illicit income, this might have sparked an investigation that might have ultimately led to Gricco. Thus, not only did Gricco have strong grounds to foresee that the participants he advised would not report their illegal income, but a rational jury could conclude that he had also a reason to desire this result and that the result was something that he specifically intended. Viewing all of the evidence against

8

Gricco together, we hold that it is sufficient to support his conspiracy conviction.

We reach the same conclusion respecting McCardell. McCardell admitted that Gricco told him to purchase a safe and that he did so. A rational jury could infer that McCardell agreed upon the objective of not reporting or paying taxes on the illicit income because to do so would have created a risk of discovery. We cannot say that the evidence against McCardell is insufficient as a matter of law.

III.

In addition to the conspiracy count, Gricco and McCardell were each convicted of multiple counts of tax evasion, in violation of 26 U.S.C. S 7201, and making false tax returns, in violation of 26 U.S.C. S 7206(1). Gricco and McCardell contend that their convictions for violating S 7201 and S 7206(1) merge and that the district court therefore erred in entering judgments of convictions and sentences under both provisions.

Neither Gricco nor McCardell raised this argument in the district court, and therefore our review is governed by Fed. R. Crim. Proc. 52 (b), which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In order to reverse under Rule 52(b), "[t]here must be an `error' that is `plain' and that `affect[s] substantial rights.' " United States v. Olano, 507 U.S. 725, 732 (1993). "Moreover, Rule 52(b) leaves the discretion to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error " `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." ' " Id. (citations omitted).

In this case, the parties' briefs focus primarily on the question whether the district court committed any sort of error at all, and both sides advance reasonable arguments relating to that question. Whether a defendant may be punished under two separate statutory provisions for the same act or transaction depends on the intent of the

9

lawmakers. See Ball v. United States, 470 U.S. 856, 861 (1985). It is presumed, however, that punishment under both provisions was not intended if the provisions proscribe the "same offense," see, e.g., Rutledge v. United States, 517 U.S. 292, 297 (1996), and whether two provisions proscribe the same offense is generally determined by applying the rule set out in Blockburger v. United States, 284 U.S. 299, 304 (1932), which asks whether each offense requires proof of an element that the other does not. If each offense contains such an element, it is presumed, subject to rebuttal, that multiple punishment is allowed. See Rutledge, 517 U.S. at 297; Blockburger, 284 U.S. at 304.

In the present case, the government argues that the offenses of tax evasion (26 U.S.C. S 7201) and making a false return (26 U.S.C. S 7206(1)) each contain an element that the other lacks. The offense of tax evasion requires proof of an attempt to evade the payment of a tax that is due, whereas the offense of making a false return does not require proof of this element: a taxpayer who makes a material misstatement of fact on a return may be convicted under 26 U.S.C. S 7206(1) even if the taxpayer pays the full amount that is due. Similarly, the offense of making a false return requires proof of a false statement on a return, whereas a violation of 26 U.S.C. S 7201 may be shown even if the taxpayer did not file a return at all.

The defendants argue, however, that the Blockburger test merely raises a presumption that Congress meant to permit punishment under both provisions, that many other circuits have held that the offenses of tax evasion and making a false return merge when they are based on the same act,3 and that the Supreme Court in Sansone v.

_____

3. See United States v. Dale, 991 F.2d 819, 858–59 (D.C. Cir. 1993) (S 7206 and S 7201 convictions merge where both were premised on the same improper tax deductions); United States v. Sturman, 951 F.2d 1466, 1487–88 (6th Cir. 1991) (simultaneous convictions for S 7201 and S 7206 may stand only where proof of tax evasion does not necessarily prove the preparation and filing of a fraudulent return); United States v. Helmsley, 941 F.2d 71, 99 (2d Cir. 1991) (S 7201 and S 7206 counts merge where both were premised on omission of the same item of income from the same tax returns); United States v. Hooks, 848 F.2d 785, 791

10

United States, 380 U.S. 343, 349 (1965), stated that the offense of filing a false return, in violation of 26 U.S.C. S 7203, may be a lesser included offense of tax evasion in some circumstances.

We find it unnecessary in this case to decide whether the district court committed an error in entering judgments of conviction and imposing sentences on both offenses. Assuming for the sake of argument that the district court erred, we conclude that the other prongs of the test under Rule 52(b) are not met. The sentences imposed on Gricco and McCardell for making false returns are concurrent to their sentences for tax evasion, and thus the former sentences do not increase the length of their incarceration. The only immediate practical effects of the concurrent sentences on the S 7206(1) counts are special assessments totaling $700 for each defendant. Recently, in United States v. Roberts, 262 F.3d 286, 292-94 (4th Cir. 2001), the court held that concurrent sentences and small special assessments were insufficient to show that the defendants' substantial rights had been affected by an alleged error and did not provide an adequate basis for the court, in the exercise of its discretion, to notice an error under Rule 52(b). We reach the same conclusion here. We do not believe that Gricco and McCardell have suffered a deprivation of "substantial rights," and in the exercise of our discretion, we decline to entertain the argument that the defendants did not raise below.

_____

n.3 (7th Cir. 1988) (noting that S 7206 is included within S 7201); United States v. Franks, 723 F.2d 1482, 1487 (10th Cir. 1983) (finding no double sentencing because the S 7201 count was based on filing false tax returns which understated income, and the S 7206 count was based on tax returns that misrepresented information on foreign accounts); United States v. Pulawa, 532 F.2d 1301, 1301 (9th Cir. 1976) (S 7206 and S 7201 merge where the tax evasion was "accomplished by means, inter alia, of perjured tax returns"); see also United States v. Humphreys, 982 F.2d 254, 262 (8th Cir. 1992) (stating that S 7207, the misdemeanor of filing a false return is included within S 7201); United States v. Stone, 702 F.2d 1333, 1340 (11th Cir. 1983) ("The government agrees that in this particular case the S 7206(1) offenses are lesser-included [offenses within S 7201].").

IV.

McCardell challenges the sufficiency of the evidence supporting his convictions for tax evasion, in violation of S 7201, and making false returns, in violation of S 7206(1). In considering this argument, we must again view the evidence in the light most favorable to the verdict and ask whether a reasonable jury could find beyond a reasonable doubt that McCardell committed these offenses. See Frorup, 963 F.2d at 42.

At least ten participants in the underlying scheme testified that McCardell was involved in the thefts. In addition, Robert Walker, an investigator from the New Jersey Division of Criminal Justice, testified that from 1991 to 1994, McCardell spent $161,000 in excess of documented income. App. at 998. IRS agent Frank Bucci took figures from Million's testimony about the proceeds that he received each year (which should be the same as McCardell's proceeds since they received equal portions) and compared these figures to the sums that McCardell had reported on his tax returns. App. at 1065-66. Agent Bucci concluded that the discrepancy between the two sets of numbers gave rise to an additional tax liability of $57,761 for the years 1992, 1993, and 1994. App. at 1059. McCardell does not dispute that he signed the tax returns, which contain declarations that the signatures were made under penalty of perjury. App. at 1140. Taken together, this evidence is sufficient to establish that McCardell attempted to evade taxes and made false returns. There is substantial evidence from which a rational factfinder could find beyond a reasonable doubt that the elements of both S 7201 and S 7206(1) were proven.

V.

Both appellants claim that the district court made erroneous evidentiary rulings relating to the prior state prosecution. First, they argue that the federal government was collaterally estopped from introducing evidence of the thefts because the appellants had already been acquitted of theft charges in state court. We reject this argument because collateral estoppel does not apply in successive

12

prosecutions by different sovereigns. United States v. Bell, 113 F.3d 1345, 1351 n.6 (3d Cir. 1997); United States v. Pungitore, 910 F.2d 1084, 1106 n.18 (3d Cir. 1990). It is well settled that there is no violation of the Double Jeopardy Clause or the Due Process Clause in successive prosecutions for the same offense by the federal government and a state government. See, e.g., Abbate v. United States, 359 U.S. 187, 194 (1959); Bartkus v. Illinois, 359 U.S. 121, 137 (1959); United States v. Lanza , 260 U.S. 377, 382 (1922). Since different sovereigns are permitted to prosecute the same defendant for the same crime,"[i]t would be anomalous indeed if a sovereign were allowed the greater power of reprosecuting individuals for offenses for which they had been acquitted but were denied the lesser power of proving the underlying facts of such offenses." United States v. Tirrell, 120 F.3d 670, 677 (7th Cir. 1997).

Second, the appellants argue that the district court erred in refusing to admit evidence of their state acquittals. It is well established, however, that evidence of prior acquittals is generally inadmissible. See, e.g., United States v. De La Rosa, 171 F.3d 215, 219 (5th Cir. 1999); United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998); United States v. Thomas, 114 F.3d 228, 249-50 (D.C. Cir. 1997); Prince v. Lockhart, 971 F.2d 118, 122 (8th Cir. 1992); United States v. Jones, 808 F.2d 561, 566 (7th Cir. 1986); United States v. Irvin, 787 F.2d 1506, 1516-17 (11th Cir. 1986); United States v. Sutton, 732 F.2d 1483, 1492 (10th Cir. 1984); McKinney v. Galvin, 701 F.2d 584, 586 n.5 (6th Cir. 1983); United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979). "A judgment of acquittal is relevant to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy or of collateral estoppel. But once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted." United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979). "[A]lso a judgment of acquittal is hearsay. The Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal." Id . See also, e.g., 2 McCormick on Evidence, S 298 (John W. Strong ed., 5th ed. 1999). Judgments of acquittal, however, are still

13

inadmissible in large part because they may not present a determination of innocence, but rather only a decision that the prosecution has not met its burden of proof beyond a reasonable doubt. Finally, even if the judgments of acquittal were admissible, exclusion under Fed. R. Evid. 403 would be justified -- and highly recommended-- because the danger of jury confusion would greatly outweigh the evidence's limited probative value. 4 See, e.g., De La Rosa, 171 F.3d at 219-20.

VI.

Gricco argues that the district court erred in admitting evidence of his role in an earlier, separate scheme to embezzle money from the airport. Gricco contends that the district court should have excluded this evidence under Federal Rule of Evidence 404(b) because the government offered the evidence solely to show Gricco's propensity for criminal activity.

In a pre-trial memorandum, the government revealed that it intended to introduce evidence that in 1988 Gricco had employed three cashiers to embezzle money from airport parking facilities using counterfeit replacement tickets that he provided to them. Government's Trial Memorandum, reproduced in Gricco Br. at A18. The government argued that this evidence was admissible under Rule 404(b) because it "help[ed] establish Gricco's plan to steal money from the Airport, his opportunity to do so, his relationship with members of the scheme, and his intent and knowledge." Id. at A20. At trial, the cashiers who had participated in the earlier theft testified concerning Gricco's role in that plot. The government offered this testimony to show that, prior to the commencement of the scheme involved in this case, Gricco already knew that he could steal money from the parking facilities using counterfeit

_____

4. It has frequently been stated that judgments of acquittal are not even relevant on the issue of guilt because " `they do not necessarily prove innocence but may indicate only that the prosecution failed to meet its burden of proof beyond a reasonable doubt as to at least one element of the crime.' " McKinney v. Galvin, 701 F.2d 584, 586 n.5 (6th Cir. 1983) (citation omitted).

14

tickets and that he knew that he could rely on the cashiers who had participated in the earlier scheme. The government stated that the probative value of this evidence outweighed any unfair prejudicial effect because the evidence "does not suggest that the jury should reach a decision based on an improper basis; rather, the evidence is integral to establish the scheme." Id. at A19.

The district court ordered that the evidence of the prior theft could be used only to establish "the relationship between Gricco and the cashiers he hired to steal, his opportunity to run the scheme to steal, and his intent and knowledge about the scheme." District Court's Pretrial Order, reproduced in Gricco Br. at A6.2. The district court also cautioned the jury on the limited use of the evidence and instructed it not to draw any inferences of bad character from it. App. at 218-19, 1402-04.

A trial court's evidentiary rulings under Rule 404(b) "may be reversed only when they are clearly contrary to reason and not justified by the evidence." United States v. Murray, 103 F.3d 310, 316 (3d Cir. 1997) (citation and quotation omitted). Even under this standard, we are doubtful about the propriety of admitting evidence of Gricco's involvement in the prior scheme.

In order to admit evidence under Rule 404(b), "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." United States v. Himelwright, 42 F.3d 777, 782 (3d Cir. 1994). Here, Gricco was on trial for tax offenses, not theft. While the evidence of the prior thefts may have been relevant to show an intent to commit further thefts, it is questionable whether this evidence was relevant to show an intent to commit the tax offenses. See id. ("In order to admit evidence under the`intent' component of Rule 404(b), intent must be an element of the crime charged and the evidence offered must cast light upon the defendant's intent to commit the crime.") (emphasis added). Nor was evidence of the earlier scheme particularly relevant to show Gricco's opportunity to carry out his tax offenses or the knowledge needed to do so.

15

We find it unnecessary, however, to decide whether the district court erred in admitting the evidence, because it is "highly probable that the evidence . . . did not contribute to the jury's judgment of conviction," Murray , 103 F.3d at 319 (quoting previous Third Circuit precedent), and its admission was therefore harmless. Because there was overwhelming evidence in the form of the co-conspirators' testimony to establish the 1990-1994 scheme to steal from the Parking Authority, we are convinced that the jury would have found that Gricco derived unlawful gains from this scheme even without any evidence that Gricco had participated in the earlier scheme. Accordingly, the admission of the Rule 404(b) evidence is not a ground for reversal.

VII.

McCardell argues that the district court erred in admitting out-of-court statements under the co-conspirator exception to the hearsay rule.5See Fed. R. Evid. 801(d)(2)(E). In making this argument, McCardell's brief cites a passage in the trial transcript in which McCardell's counsel objected when a cashier began to relate certain statements made to her by Gricco. McCardell Br. at 34. McCardell's attorney objected on the ground that there had been no evidence of Gricco's participation in a conspiracy and that Gricco's out-of-court statements were therefore inadmissible hearsay. App. at 92. The district court overruled the objection after the government assured the court that it would establish the existence of a conspiracy. App. at 92.

We hold that Gricco's statements were properly admitted against McCardell under Rule 801(d)(2)(E), which governs statements by "a coconspirator of a party during the course and in furtherance of the conspiracy." To admit statements under this rule, it must be shown by a preponderance of the evidence that "(1) a conspiracy existed; (2) the declarant

_____

5. Gricco's brief adopts by reference all of the applicable arguments made by McCardell, but this argument is not applicable to Gricco. Out-of-court statements by Gricco were admissions by a party opponent and are thus not hearsay under Fed. R. Evid. 801(d)(2)(A).

16

and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." United States v. Ellis, 156 F.3d 493, 496 (3d Cir. 1998). In this case, as we have held, the evidence sufficed to show that McCardell and Gricco both were members of a conspiracy having as one of its objectives the impeding of the IRS. In addition, the evidence very clearly showed that they were both members of a conspiracy to steal money from the airport. This latter conspiracy provided an additional basis for admitting co-conspirator statements even though this theft conspiracy was not charged in the indictment. See id. at 497 (statements are admissible pursuant to Rule 801(d)(2)(E) even if the basis for admission is a conspiracy different from the one charged). Thus, the district court did not err in admitting Gricco's statements.

VIII.

The appellants raise numerous challenges to their sentences. We vacate the sentences and remand for a new calculation of the tax loss. On remand, the district court should make specific findings of fact rather than merely adopting the Presentence Reports (PSRs), as it did at the sentencing hearing.

Federal Rule of Criminal Procedure 32(b)(6) permits a sentencing court to accept a presentence report as its findings of fact, but there is an exception for "any unresolved objection" to the presentence report. "For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed. R. Crim. P. 32(c)(1). We have stated that "[a] finding on a disputed fact or a disclaimer of reliance upon a disputed fact must be expressly made. . . . This Rule is strictly enforced and failure to comply with it is grounds for vacating the sentence." United States v. Electrodyne Sys. Corp., 147 F.3d 250, 255 (3d Cir. 1998).

Before the district court, the appellants disputed almost

17

all of the factual bases for sentencing, including the amount of tax loss, which dictated their base offense level. The PSRs did not detail how the tax loss was calculated, and the district court's brief statement that it was adopting the PSRs was inadequate to satisfy Rule 32(c)(1)'s requirements.[6] Although defense counsel stated at the sentencing hearing that they would rely on their written objections rather than orally present their arguments, the district court should have made specific findings regarding the disputed facts that were relevant to sentencing.

A.

For tax offenses, a defendant's base offense level is determined by the tax loss. U.S.S.G. SS 2T1.1(a)(1), 2T1.9.[7] If the offenses involved underreporting of gross income on a personal tax return, the tax loss is treated as equal to 28% of the unreported income, unless a more accurate determination of the tax loss can be made. U.S.S.G. S 2T1.1(c)(1)(A). The base offense level is 18 for a tax loss of more than $550,000 but less than $950,000. The base offense level is 19 for a tax loss of more than $950,000 but less than $1,500,000. The PSRs for Gricco and McCardell applied a base offense level of 19, based on a tax loss of $952,000. This amount was calculated by taking 28% of $3.4 million, the total sum of money that the government asserted was stolen from the airport. The PSRs adopted this $3.4 million figure from the government's sentencing

_____

6. At the sentencing hearing, the District Court stated:

    I have read your arguments carefully, I have read the government's response carefully. I have also read the probation officer's response likewise.

    I am satisfied this report is correct in all respects. I am therefore going to find as a fact, that this is -- that these facts are accurate and correct in all respects and I will therefore adopt these reports.

App. at 1495.

7. The 1998 Sentencing Guidelines apply.

18

memorandum. As we detail below, the sentencing memorandum was inadequate and inaccurate.[8]

1.

The Sentencing Guidelines provide that the base offense level shall be determined based on relevant conduct, which includes the defendant's own conduct and, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. S 1B1.3(a)(1)(B). In order to be included in determining the defendant's offense level, the loss resulting from the acts or omissions of others must be: "(1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." United States v. Duliga, 204 F.3d 97, 100 (3d Cir. 2000).

Here, the total tax loss associated with the funds stolen from the airport by all of the participants is properly attributed to both Gricco and McCardell. Any participant's failure to report unlawful proceeds was "in furtherance of the jointly undertaken activities," within the scope of the agreement, and "reasonably foreseeable" in connection with the embezzlement scheme. Id. Consequently, the tax loss arising from the total amount of money stolen from the

---

8. Just before oral arguments in this appeal, the government submitted a letter advising us that it would agree to a remand for reconsideration of the tax loss. The government stated that it would advocate a base offense level of 18 because its estimated tax loss of $952,000 was only $2000 above the threshold for a base offense level of 19. The government stated that it continued to believe its calculations to be permissible and persuasive. We have found several errors in the government's calculations, and we therefore find it necessary to remand for a complete recalculation.

19

airport by all of the participants is properly attributed to both appellants.

2.

A sentencing court is permitted to make "a reasonable estimate based on the available facts" where the exact amount of tax loss may be uncertain. Application Note 1 to U.S.S.G. S 2T1.1; see also United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999); United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997). Since the cashiers who testified admitted that they did not report any of their illicit gains on their tax returns, the assumption that the entire amount stolen from the airport contributed to the tax loss is valid. The district court was not obligated to pore through the tax returns of all of the participants in the airport theft to determine the exact amount of unreported income. See Spencer, 178 F.3d at 1368 (refusing to require a court to scrutinize all employee tax returns over the course of an employer's fraudulent scheme in order to generate a more precise tax loss computation).

The estimate of the tax loss, however, still must be reasonable and based on available facts. The government's brief on appeal offers one method for arriving at the $3.4 million that it alleges was the total amount stolen from the airport. At trial, government expert Jeffrey Gemunder testified that airport records revealed that $1,396,960 was stolen between September 1993 and September 1994. App. at 855. The government's brief reasons as follows: (1) Flannery testified that his proceeds increased by 10-20% each year between 1990 and 1994, and Million testified that his proceeds increased by 20-50% each year; (2) to give the appellants "the benefit of the doubt," the government picked 30% as the annual growth rate of the scheme; (3) since the scheme grew by 30% each year and $1,396,960 was stolen during the last year of the four-year scheme, the amount stolen during the third year was 70% of $1,396,960 or $977,872); (4) the amount stolen during the second year was 70% of the amount stolen in the third year and so forth; and (5) the amounts stolen per year add up

20

to roughly $3.4 million. Gov't Br. at 78-9.

There are several errors in this approach. First, the testimony of Flannery and Million does not support the percentage growth figures on which the government relies. Flannery and Million estimated the amounts of money that they derived from the scheme each year, and these figures are not consistent with the percentage ranges given by the government.[9] Second, even if these percentages are accepted, the government has not provided a reasonable explanation for choosing an overall growth rate of 30%. The government says that it gave the appellants the benefit of the doubt, but if it had really done so, it would have chosen the highest percentage in the ranges. Third, even accepting the 30% figure, the government's method of calculating income in prior years is mathematically incorrect.[10] Fourth, the government's method was not used in the PSRs or by the district court. In fact, this method was not even presented to the district court. The government's brief on appeal offers only this post-hoc justification and fails to explain how the PSRs or the district court arrived at the $3.4 million.[11]

_____

9. The chart below shows the illegal income to which Flannery and Million testified:

|  | Flannery (App. at 228-29) | Million (App. at 389-90) |
| --- | --- | --- |
| 1990 | $30,000 | $400 / week |
| 1991 | $70,000-80,000 | $500-600 / week |
| 1992 | $80,000-90,000 | $750 /week |
| 1993 | $100,000 | $2000 / week |
| Jan. – Sept. 1994 | $72,000-75,000 | $3000-3300 / week |
| 1990-1994 | $300,000 | $345,000-400,000 |

10. Instead of calculating 70% of the income obtained in the later year, the income earned in the later should have been divided by 1.3.

11. The government's brief on appeal offers one other method of calculating the loss of $3.4 million: "When Million was asked how much he believed he made in total, he testified that he made at least $400,000. That means that the four top level thieves made at least $1.6 million

21

The government did file a sentencing memorandum with the district court and, presumably, this is what the district court and the PSRs relied upon. The memorandum arrived at a total theft loss of $3.4 million by adding together (a) the unlawful proceeds that the testifying cashiers admitted to earning, (b) the amounts earned by nontestifying cashiers, based on the assumption that each cashier earned $600 for each week that he or she participated in the theft, (c) the $297,000 that Million testified to receiving, (d) the $352,000 that Flannery testified to receiving, and (e) $352,000 attributed to each of Gricco and McCardell, based on the inference that each received the same amount as Flannery's cut. The memorandum resolved all ambiguities in the defendants' favor and summed up these figures to arrive at a total theft lost of "at least $2,559,600."[12] App. at 1483–84. The sentencing memorandum then concluded that "[g]iven the expert testimony in the case, the loss easily reached $3.4 million for a tax loss of $952,000, establishing a base offense level of 19." App. at 1484. The government has not offered any explanation for the leap from $2,559,600 to $3.4 million and has not pointed to any expert testimony supporting such a leap. Since the government's memorandum, the district court, and the PSRs all fail to provide a coherent factual basis for the calculation of a $3.4 million theft loss, the corresponding tax loss of $952,000 is not a "reasonable estimate."[13]

---

[since they received cuts equal to that of Million], leaving $1.8 million for the other 15 thieves to reach a theft loss figure of $3.4 million. Plainly, there was sufficient evidence in the record for the court to find a theft loss of $3.4 million and a resultant tax loss of $952,000." Gov't Br. at 78–79. We fail to see how this circular reasoning leads to a finding that the theft loss was $3.4 million.

12. It does not appear that the government added up its own numbers correctly.

13. The appellants' sentencing memorandum comes up with a total theft loss of $1,668,500. App. at 1454. We see several errors in this figure, including miscalculation of the amounts received by the testifying cashiers, omission of the amounts received by the non-testifying cashiers, and improper limitation of the tax loss to the years 1992, 1993, and 1994. Under the relevant conduct provisions of the Sentencing Guidelines, the tax loss arising from the entire scheme, from 1990 to 1994, should be attributed to the appellants.

22

Accordingly, we remand for a new calculation of the amount of tax loss.

B.

McCardell appeals the four-level increase in his base offense level under U.S.S.G. S 3B1.1 for his aggravating role. The Guidelines provide for such a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. S 3B1.1(a). The Guidelines provide for a three-level increase if the defendant was a manager or supervisor, but not an organizer or leader, in an extensive criminal activity, and a two-level increase if the defendant had a leadership role in less extensive criminal activity. U.S.S.G. SS 3B1.1(b) and (c). Factors to consider include:

> (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.

United States v. Hunter, 52 F.3d 489, 492 (3d Cir. 1995). The determination of a defendant's role is based on all conduct within the scope of the relevant conduct guideline, U.S.S.G. S 1B1.3, and not solely on the acts in the counts of conviction. Introductory Commentary to U.S.S.G. Ch. 3 Pt. B.

The district court did not err in applying the leadership role enhancement to McCardell. McCardell's role in the theft is relevant conduct under U.S.S.G. S 1B1.3, and the scheme involved four leaders and at least 15 cashiers. Flannery, Million, and the cashiers testified that McCardell was one of the four leaders of the scheme. App. at 81, 192, 281, 309, 364. Million described McCardell as the"second man in command" under Gricco, and one cashier testified that McCardell was in charge when Gricco was not present. App. at 93, 112, 364, 384. Although Flannery came up with

23

the ticket-swapping plan and initially approached Million and Gricco to participate, Flannery testified that McCardell was involved in discussions regarding the development and expansion of the scheme. App. at 211, 225. McCardell was also involved in the enlistment and training of cashiers and was present when at least one cashier was recruited. App. at 91, 382. He helped to distribute the counterfeit tickets to the cashiers and often collected the money at the end of the day. App. at 99, 100, 220-21. McCardell received the same amount of unlawful proceeds as Gricco, Million, and Flannery. App. at 225. This evidence supports the four-level increase in McCardell's offense level.

C.

McCardell contests the two-level increase he received because he "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." U.S.S.G. S 2T1.1(b)(1). McCardell argues that the government did not prove that his unreported income exceeded $10,000 in any of the relevant years.

Flannery and Million testified to the amounts they received in each of the years from 1990 to 1994, and these annual amounts greatly exceeded $10,000. See supra note 9. These amounts apply to McCardell as well, since he and the three other leaders received equal cuts. McCardell reported a total taxable income of $30,195 in 1992; $22,955 in 1993; and $27,643 in 1994. App. at 111a, 118a, 126a. Subtracting these reported figures from the amounts he gained from the theft scheme shows that he had more than $10,000 in unreported income each year. IRS Agent Bucci also testified that McCardell's unreported income for the three-year period between 1992 and 1994 was $239,5000. App. at 1066. The sentencing enhancement was proper.

D.

McCardell's and Gricco's offense levels were increased by two levels because the district court believed that their offenses "involved sophisticated concealment." U.S.S.G. S 2T1.1(b)(2). Application Note 4 to U.S.S.G.S 2T1.1(b)(2)

24

describes sophisticated concealment as "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment." The government supports the application of this enhancement with evidence that the appellants engaged in intricate financial transactions to hide their unlawful income from the IRS and also used counterfeit parking tickets as a sophisticated means of concealing their theft of money from the airport. The appellants argue that the use of the counterfeit tickets and the complexity of the embezzlement scheme do not demonstrate sophisticated concealment because the sophisticated concealment must be in relation to the tax evasion, not the theft scheme.

In United States v. Cianci, 154 F.3d 106 (3d Cir. 1998), the defendant pled guilty to tax evasion stemming from his failure to report income obtained through embezzlement and kickbacks. His plea agreement stipulated that the offense level should be increased under the sophisticated concealment provision. He later challenged this increase, contending that while his embezzlement scheme was sophisticated, his means of hiding income from the IRS was not. This court's ultimate holding was that the defendant could not challenge the increase because he was bound by the stipulation in his plea agreement. Id. at 110. The court did note that even if it were to look beyond the stipulation, there would be adequate support for the finding that the defendant "employed sophisticated means to conceal his tax evasion from the IRS." Id. at 110 (emphasis added). He used shell corporations, falsified documents, and failed to record cash payments. The court also observed: "Admittedly, the methods devised by Cianci impeded discovery by [his employer] of his embezzlement, but they also facilitated concealment of the income derived from the embezzlement and thereby the necessity to report it to the government and pay taxes on it." Id. (emphasis added). Such methods included accepting benefits in the form of a car and money orders instead of cash and falsifying the company's records in order to impede discovery of his unlawful income.

25

It is clear that the Cianci panel viewed the complexity of the embezzlement and kickback schemes as inadequate in themselves to support a sophisticated-concealment enhancement. Instead, the panel looked to the complexity of the measures taken to conceal the tax evasion in order to justify application of the sophisticated concealment enhancement. Moreover, the Background Commentary to U.S.S.G. S 2T1.1 states: "Although tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." (emphasis added). This statement supports the interpretation that efforts to conceal must be efforts to conceal the tax offense in order to be considered under this Guideline.

Although the appellants interpret the Guideline properly, the findings that the appellants engaged in sophisticated concealment of their tax offenses are well-supported by the evidence. Gricco loaned cash to others and asked for repayment in the form of money orders and checks made out to him or to a title company. App. at 129, 451, 535, 571. He purchased real estate in his name and in the names of family members. He gave cash to family members and received checks in return to buy more property. App. at 403-04. Between 1991 and 1994, Gricco spent over $1.365 million on real estate purchases. Of this amount, $160,000 was in cash, and $121,000 was from relatives. App. at 989. Capozzi, Gricco's real estate agent, testified that Gricco used large amounts of cash for his purchases and instructed Capozzi to "keep a low profile." App. at 628-630. Capozzi converted the cash into money orders and then deposited it into an escrow account used for purchasing properties. In order to avoid filing currency transaction reports with the IRS, Capozzi purchased the money orders in small amounts and occasionally went to several different branches of the same bank to purchase the money orders. App. at 629-32. An investigator with the New Jersey Division of Criminal Justice testified that Gricco had deposited $372,000 of cash into banks between 1991 and 1994 but that not a single deposit was for more than $10,000. App. at 974. Gricco would have had to file a

26

report with the IRS if his deposits had exceeded that amount.

This evidence supports a finding of sophisticated concealment through currency structuring, use of cash to avoid reporting requirements, and the use of family members' names to hide assets. See, e.g., United States v. Middlemiss, 217 F.3d 112, 124 (2d Cir. 2000) (hiding assets by placing them under family members' names, concealing interests in a business, creating an extensive false paper trail of corporate documents, and accepting only cash payments for the extortion they committed established sophisticated concealment); United States v. Guidry, 199 F.3d 1150, 1158-59 (10th Cir. 1999) (structuring transactions to avoid Currency Transaction Reports serves "the main purpose of shielding the transaction from the Internal Revenue Service," and properly served as a basis for the enhancement).

The district court also did not err in applying the enhancement to McCardell. Real estate agent Capozzi testified that McCardell's wife used cash to purchase properties under both her name and McCardell's name. App. at 658, 661, 673-76. Between 1991 and 1994, McCardell spent $341,000 on real estate purchases. Of this amount, $33,000 was in cash, and $80,000 came from the accounts of family members. App. at 1001-02. McCardell explained the cash flow from his mother-in-law by asserting that his wife received money from her to pay her bills. App. at 1129. However, conduct may support an inference of a tax evasion motive even if a defendant proffers an innocent rationale for his or her conduct. Voigt, 89 F.3d at 1090. Between 1991 and 1994, McCardell deposited about $169,000 of cash into banks, but none of the deposits involved more than $10,000 at any one time. This evidence showed that McCardell structured his currency transactions, laundered money through real estate purchases, and hid assets under family members' names. The district court did not clearly err in finding that these activities constituted more than run-of-the-mill tax evasion.

E.

Gricco and McCardell received a two-level increase in their offense levels because each "abused a position of

27

public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. S 3B1.3. The appellants argue that they never held a position of trust in relation to the victim which, in this case, is the IRS. They further argue that they did not even hold a position of trust at the airport at which they were employed.

The appellants' first argument is directly foreclosed by United States v. Cianci, supra. In Cianci, the defendant was convicted of tax evasion for failing to report income that he had received from embezzlement and kickbacks. The defendant's position as a high-ranking official in a corporation enabled him to embezzle money and receive kickbacks but, the defendant argued, he did not hold a position of trust with respect to the IRS, and the IRS was the victim of his offense of conviction. This court rejected the defendant's argument, reasoning that consideration of the defendant's trust relationship to his corporation was proper consideration of "relevant conduct" under U.S.S.G S 1B1.3 for sentencing purposes. Cianci , 154 F.3d at 112. Accordingly, we must reject Gricco's legal argument.

We review for clear error the findings that McCardell and Gricco held positions of trust vis-a-vis the airport. Gricco was the regional manager for the parking lots at the airport. App. at 1117. He supervised the parking lots, was responsible for staffing, and operated the petty cash fund at the lots. App. at 1177. McCardell was employed as a supervisor at the parking facilities. He watched the toll plazas, collected the receipts from the cashiers, handled customer complaints, and did "just about everything." App. at 1114. Both Gricco and McCardell had sufficient managerial and discretionary authority to warrant sentencing enhancements for an abuse of a position of trust.

F.

Gricco and McCardell each received a two-level increase under U.S.S.G. S 3C1.1 for obstruction of justice. The appellants' PSRs indicated that the enhancement was applied because the appellants "testified falsely regarding

28

[a] material matter during trial." App. at 1492. The appellants claim that they did nothing but testify in their own defense at trial and that this cannot be the basis for an obstruction of justice enhancement. This argument was squarely rejected by the Supreme Court in United States v. Dunnigan, 507 U.S. 87 (1993) (holding that the enhancement does not violate a defendant's right to testify and is properly applied where the defendant commits perjury).

The appellants further argue that the district court erred by failing to make findings as to which of their statements were perjurious. The Supreme Court has required sentencing courts to "review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice" under the definition of perjury.14 Dunnigan, 507 U.S. at 95. Our court, has held, however, that express findings on the elements of perjury, although preferable, are not required. See United States v. Boggi, 74 F.3d 470, 479 (3d Cir. 1996). In Boggi, the sentencing court stated: "I don't see how, in view of his flat denials and the jury's conviction, that you can find otherwise than that he testified falsely on the stand." Id. at 478. Although the sentencing court did not make express findings as to the elements of perjury, our court reviewed the record and found that the district court's application of the enhancement necessarily included findings on the elements and that the findings were supported by the record. The reference to "flat denials," we concluded, was a finding that Boggi willfully intended to provide false testimony and that the untruths were material because Boggi would not have been convicted had the jury believed him. Accordingly, we refused to remand "merely because the district court failed to engage in a ritualistic exercise and state the obvious for the record." Id. at 479.

The district court here likewise failed to make specific findings as to which statements constituted perjury. The

_____

14. A witness testifying under oath or affirmation commits perjury if she "gives false testimony concerning a material matter with the willful intent
to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94.

29

district court stated only that Gricco had "testified falsely regarding material matter during trial" and that McCardell was receiving "[t]wo levels upward adjustment for obstruction of justice." App. at 1492, 1494. Nevertheless, as in Boggi, we will not remand simply for the district court to make findings of fact that are implicit in the record. It is obvious that Gricco and McCardell -- both of whom denied any participation in embezzling the money from the airport and in underreporting their income -- committed perjury.

G.

The appellants argue that the district court failed to comply with 18 U.S.C. S 3553(c)(1), which requires a sentencing court to state in open court its reasons for imposing a sentence at a particular point within a Guideline range if that range spans more than 24 months. The Guideline range determined by the District Court was 108-135 months, and the court sentenced McCardell to 108 months of imprisonment and Gricco to 120 months. Before pronouncing sentence, the district court made some preliminary comments:

> One, is this [sic] the kind of offense that occurs much too often in this community and almost becomes a way of life. And, these two defendants were very important people in organizing and carrying out this thing, to the extent that just about the entire Parking Authority at the airport was corrupted through it, even to the extent of recruitments to engage in it. For that reason, it seems to me that this is a very serious matter and one that should be dealt with appropriately to somehow get the message across to this community, that this kind of action simply cannot be tolerated.

App. at 1513. Since the district court did give concrete reasons for its choice of sentences, it satisfied the requirements of 18 U.S.C. S 3553(c)(1).15 See United States

_____

15. The explanation given by the district court sufficiently explains why it did not sentence Gricco to a lower term of imprisonment within the Guidelines range. The district court sentenced McCardell to the shortest term allowed by the Guideline range. Although the District Court did not provide an explanation for McCardell's sentence, this error is harmless, as McCardell received the lightest sentence possible.

30

v. Rosa, 11 F.3d 315, 344 (2d Cir. 1993) ("[I]t is sufficient for the court to advert to a given factor or factors in selecting a point within the range.").

H.

McCardell challenges the district court's finding that he had the ability to pay a fine. McCardell did not contest the portions of the PSR showing that he had assets of $215,111 and no outstanding debts, although he did have a negative net monthly cash flow of $960.41. McCardell PSRPP 58, 59, 64. At sentencing, the district court noted that McCardell had rather substantial assets and decided that McCardell could trim down his standard of living and pay a fine out of his assets. App. at 1501. The district court's finding is not clearly erroneous, and we uphold the $75,000 fine that was imposed.

I.

The appellants also challenge their sentences under Apprendi v. New Jersey, 530 U.S. 466 (2000). However, their sentences do not run afoul of Apprendi because the appellants were sentenced below the statutory maximum for each count of conviction. See United States v. Williams, 235 F.3d 858 (3d Cir. 2000).

J.

The government agrees that the District Court applied the wrong version of 18 U.S.C. S 3013 in imposing the special assessments. For felony offenses, the amount of special assessment is $50 per count if committed prior to April 24, 1996, and $100 per count if committed after that date. 18 U.S.C. S 3013; Application Note 2 to U.S.S.G. S 5E1.3. The tax conspiracy for which the appellants were convicted occurred from 1990 to 1997. Gricco filed his return for the 1992 calendar year in 1993. Thus, Gricco should have been assessed $100 for the conspiracy conviction, $100 for tax evasion committed in 1997 by filing the false 1994 tax return, $100 for filing the false 1994 tax return in 1997, $100 for tax evasion committed in 1997 by

31

filing the false 1993 tax return, $100 for filing the false 1993 tax return in 1997, $50 for tax evasion committed in 1993 by filing the false 1992 tax return, and $50 for filing the false 1992 tax return. McCardell filed his tax returns for the 1992, 1993, and 1994 calendar years in 1993, 1994, and 1995, respectively. Accordingly, he should have been assessed $50 for tax evasion based on each of these tax returns and $50 for filing each of these returns, as well as $100 for the conspiracy. We remand for the district court to impose the correct assessments.

IX.

In sum, we affirm the appellants' convictions, but we vacate their sentences and remand for new sentencing proceedings and re-sentencing.

McKEE, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority in all aspects of its opinion except for my colleagues' conclusion that there was sufficient evidence to convict McCardell of a Klein conspiracy. In United States v. Alston, 77 F.3d 713 (3d Cir. 1995) we held:

> A Klein conspiracy is comprised of three elements: (1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the agreement's objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States.

Id. at 720 n.17 (citation, internal quotations and brackets omitted). Although a defendant's failure to report income can be an overt act in furtherance of a Klein conspiracy, the government must "still prove there was an agreement whose purpose was to impede the IRS (the conspiracy), and that each defendant knowingly participated in that conspiracy." United States v. Adkinson, 158 F.3d 1147, 1154 (11th Cir. 1998) (emphasis added). Of course, where there is no direct evidence "of an agreement by all for each to evade his income taxes," the government can rely on circumstantial proof. Id.

However, "[t]he failure to disclose income is, without more, generally insufficient to establish a Klein conspiracy." Id. "To be sufficient, the evidence must establish an agreement among the conspirators with the intent to obstruct the government's knowledge and collection of the revenue due." Id. "When the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some common design with unity of purpose to impede the IRS." Id. A Klein conspiracy is not established if the evidence implies only separate purposes to evade taxes. Id. at 1155. Rather, the evidence must "support an inference that each alleged tax evader . . . knew of the others' tax evasion" and that "they agreed to [evade taxes]." Id. "Although each defendant does not have to know every act taken in furtherance of the

33

conspiracy, each defendant . . . must know that there is a conspiracy and demonstrate a specific intent to join it." Id.

McCardell argues that the government never produced any evidence that he spoke to, or agreed with, anyone about evading federal income taxes. Significantly, the government appears to concede that point. Its recitation of the evidence that McCardell was a Klein conspirator amounts to the following: (1) he told Million that he was concerned about alerting the IRS by exchanging large quantities of old $100 bills for new ones at a bank; (2) he did not report the stolen money on his federal tax returns; (3) he deposited small sums of cash to avoid generating a currency transaction report ("CTR"); (4) he purchased real estate; (5) he used Capozzi to purchase real estate and to launder the stolen money, Government's Br. at 58 n.14; and (6) he purchased a safe at Gricco's direction. Id. at 42 n.8.

I agree that the evidence is sufficient to allow a rational jury to conclude that McCardell did all of these things to avoid paying taxes, and to avoid detection; and not just to hide the proceeds of the theft. However, as noted, a Klein conspiracy requires more. That crime is not established if the evidence implies only separate purposes to evade taxes. Adkinson, at 1155. On the contrary, the evidence must "support an inference that each alleged tax evader . . . knew of the others' tax evasion" and "that they agreed to do so." Id. I do not believe that a jury could reasonably conclude that this evidence proves that McCardell knew of anyone else's tax evasion, much less that he agreed with anyone else to evade the payment of income taxes.

Essentially, the government's case against McCardell is that "the jury could infer that Gricco spoke to McCardell, his brother-in-law and chief assistant, at least that he spoke to his lower level thieves, and Million and Flannery, about impeding the IRS," because his conduct paralleled Gricco's conduct and the other Klein co-conspirators' conduct. Government's Br. at 58 n.14. Therefore, claims the government, there is sufficient evidence to support McCardell's conviction as a Klein conspirator.

Although there is authority for the proposition that a defendant's connection to a Klein conspiracy need only be

34

"slight," Adkinson, at 1152 (citation omitted), the reference to "slight" refers to the "extent of the defendant's connection to the conspiracy, not to the quantum of evidence required to prove that connection." Id., at 1152 n.10 (citation omitted). Obviously, the government must still meet its constitutional burden of proof beyond a reasonable doubt, and "slight" proof that a defendant committed a crime simply can not support a criminal conviction. Id. at 1152. At best, the government's evidence of McCardell's guilt of a Klein conspiracy was "slight." At worst, it was pure speculation. Far from resting upon substantial evidence, the government's case against McCardell boils down to the bare-bones contention that because Gricco, Flannery, Million and the cashiers were Klein conspirators; McCardell must also have been one. That is nothing more than an attempt to boot strap McCardell's conduct in the theft scheme into a Klein conspiracy by suggesting that it paralleled the conduct of Gricco and the other Klein conspirators. However, the majority correctly concedes that parallel conduct is not, by itself, enough to prove a Klein conspiracy. Majority Op. at 7. Yet, that is the only "proof " of McCardell's guilt of that offense.

Accordingly, I respectfully dissent from the majority's decision insofar as it affirms McCardell's conviction for a Klein conspiracy.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit