T.C. Summary Opinion 2007-215


UNITED STATES TAX COURT


JACK D. ELLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23041-04S.            Filed December 27, 2007.


<u>I. Jay Katz</u>, for petitioner.

<u>Thomas M. Rath</u>, for respondent.


CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any

_____

[1]  Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, in effect for the relevant period.  Rule references are to the Tax Court Rules of Practice and Procedure.

other court, and this opinion shall not be cited as precedent for any other case.

In a notice of deficiency issued to petitioner on September 10, 2004, respondent determined deficiencies as follows:

| Year | Amount |
|------|--------|
| 1992 | $14,227 |
| 1993 | 13,146 |
| 1994 | 9,856 |

Petitioner does not challenge the amount of the deficiency for any of the years in issue. Instead, petitioner claims relief from the deficiency for each year under section 6015.

## Background

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Delaware.

The circumstances surrounding the determinations of the above-referenced deficiencies are summarized in the following excerpt taken from United States v. Gricco, 277 F.3d 339, 346-348 (3d Cir. 2002):

> From 1990 to 1994, Anthony Gricco was the regional manager for private companies that contracted with the Philadelphia Parking Authority to operate the parking facilities at the Philadelphia International Airport. Gricco was responsible for the general operation of the facilities, including the hiring of employees and the collection of parking fees. Michael McCardell, Gricco's brother-in-law, was Gricco's chief assistant. McCardell oversaw the day-to-day activities of the tollbooths and picked up money from the cashiers at the end of their shifts.
>
> The parking facilities at the airport used automated ticket machines as well as cashiers. Upon

entering a lot, a customer would take a ticket from a machine. The date and time would be printed on the ticket and encoded in the magnetic strip on the back. To leave the lot, the customer would drive to a tollbooth and the ticket would be put into another machine. This machine would read the date and time of issuance, calculate the length of time that the customer had parked in the lot, and display the parking fee owed. The customer would then pay the cashier in the tollbooth. At the end of a shift, each cashier would bundle together the tickets and cash received and put them in a brown bag labeled with the cashier's name and the number of the tollbooth. Each cashier would also place in the bag a tape from the ticket-reading machine that provided a record of the tickets that the machine had processed. The supervisors then would forward the bags to Gricco's assistants.

In early 1990, Gricco, McCardell, and others made a plan to steal money by substituting customers' real tickets with replacement tickets showing false dates and times of entry. A customer who had parked in the lot for a long period of time would have a real ticket reflecting a high parking fee. On leaving the lot, the customer would pay this fee to the cashier. However, instead of inserting the real ticket into the ticket-reading machine, a cashier participating in the scheme would insert a replacement ticket, and the machine would calculate the parking fee based on the false date and time stamped on the replacement ticket. This replacement ticket would indicate that the customer had parked for only a short period of time, and thus the parking fee would be much lower. The thieves would pocket the difference between the amount paid by the customer and the amount of the fee shown on the replacement tickets.

Michael Flannery, a technician for the company responsible for maintaining the ticket machines, provided the replacement tickets. Flannery also disabled the fare displays on the ticket-reading machines so that customers could not see that the parking fees that they were paying were higher than the fees recorded by the machines.

Flannery initially supplied Gricco with replacement tickets by removing tickets from the ticket-issuing machines and then resetting the counters

on those machines.  In the beginning, Flannery obtained 30 tickets a day using this method, and one cashier, enlisted by Gricco, used the replacement tickets to steal cash.  Gricco scheduled either McCardell or David Million, another supervisor, to oversee the tollbooth plaza at which this cashier worked.  Gradually, more corrupt cashiers were enlisted, and eventually Flannery began printing counterfeit tickets.

Gricco, McCardell, Million, and Flannery expanded their scheme over the next four years.  At first, Gricco enlisted cashiers who had engaged in a similar but smaller scheme in 1988.  Eventually Gricco recruited about 15 other cashiers to participate.  Flannery delivered the counterfeit tickets that he manufactured to Gricco, McCardell, or McCardell's wife.  McCardell then distributed the replacement tickets to the corrupt cashiers, and at the end of their shifts, McCardell picked up the stolen money and forwarded it to Gricco, who distributed the money among the participants.  The cashiers received a portion of the proceeds stolen during their shifts, and the rest was divided into four equal shares for Gricco, McCardell, Million, and Flannery.

The leading participants in the scheme did not report their unlawful income on their federal income tax returns.  Gricco kept his money in a safe, loaned cash to others and received repayments in the form of checks or money orders, gave cash to family members, and placed real estate under his family members' names.  Through a real estate broker named Ludwig Cappozi, Gricco purchased several properties for cash.  Capozzi also engaged in real estate transactions with McCardell's wife, who used cash to purchase properties under both her own and McCardell's name.

The cashiers involved in the scheme also failed to report their unlawful income on their income tax returns.  They did not deposit their embezzled funds into banks for fear of being detected by the Internal Revenue Service.  Gricco cautioned some cashiers not to put their money in banks, and he advised Flannery and Million to invest in real estate through Capozzi.

The scheme ended in September 1994, when the Philadelphia District Attorney's Office executed search warrants at the airport.  In July 1996, the Commonwealth of Pennsylvania brought state charges of theft, forgery, and unlawful use of a computer against

Gricco, McCardell, Flannery, Million, and numerous cashiers. The cashiers waived their right to a jury trial and were convicted in the Philadelphia Court of Common Pleas. After a three-day jury trial, Gricco, McCardell, and Million were acquitted, and the judge dismissed Flannery's case.

In April 1999, a federal grand jury returned an indictment against Gricco, McCardell, Million, and Flannery for conspiracy to defraud the United States by obstructing the lawful function of the Internal Revenue Service in the collection of federal income taxes, in violation of 18 U.S.C. §371; tax evasion, in violation of 26 U.S.C. §7201; and making false federal income tax returns, in violation of 26 U.S.C. §7206(1). Prior to trial, Million and Flannery pleaded guilty and agreed to testify for the prosecution. Gricco and McCardell proceeded to trial.

The jury found Gricco and McCardell guilty on all counts. The government submitted a sentencing memorandum asserting that the total amount stolen between 1990 and 1994 was $3.4 million and that the tax loss was $952,000 (i.e., 28% of $3.4 million).

One of the cashiers referenced above is Carol Pulgini (petitioner's former spouse). Her involvement in the above-described scheme netted her no less than $35,000 during 1992, $32,200 during 1993, and $23,100 during 1994 (the illegal income). Needless to say, her employment with the parking authority was terminated when her involvement was discovered. She was tried, convicted, and incarcerated for various criminal charges arising from her involvement in the scheme.

Petitioner met his former spouse in December 1990. They began living together in petitioner's house in August 1991 when petitioner's former spouse was pregnant with their first child, who was born later that year. Petitioner and his former spouse

married in June 1992, when she was pregnant with their second child, born the next year.  They were divorced in May 2001.

Petitioner and his former spouse filed a joint Federal income tax return for each year in issue.  The illegal income is not included in the income reported on any of those returns.  Petitioner was not aware of his former spouse's involvement in the above-described scheme at the time he signed any of those income tax returns.

Petitioner agrees that for each year in issue, respondent has properly determined the amount of the deficiency attributable to the omission of the illegal income.  Nevertheless, according to petitioner, he should be relieved from liability for those deficiencies under section 6015.

## Discussion

In general, spouses filing a joint Federal income tax return are jointly and severally responsible for the full income tax liability ultimately determined with respect to the year for which the return was filed.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000).  "Section 6015, however, provides various means by which a spouse can be relieved of this joint and several obligation."  Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

One means is provided in section 6015(c).  Upon election of its application by the taxpayer, that section limits an

individual's liability for a deficiency to the portion of the deficiency properly allocable to that individual under section 6015(d). In general, an item that gives rise to a deficiency on a joint Federal income tax return will be allocated to the individuals who file the return in the same manner as that item would have been allocated had those individuals filed separate returns. Sec. 6015(d)(3)(A). In this case, the deficiency for each year in issue is entirely attributable to petitioner's former spouse.

Petitioner's section 6015(c) election has been made in this proceeding. Respondent agrees that petitioner is eligible to make the election and further agrees that the election is timely. See sec. 6015(c)(3)(A) and (B). Respondent argues, however, that petitioner's section 6015(c) election is not valid with respect to any of the deficiencies here in dispute because at the time petitioner signed the return for each year, he had "actual knowledge" of the "item giving rise to" the deficiency not allocable to him under section 6015(d). Sec. 6015(c)(3)(C). Respondent bears the burden of proof on the point. Sec. 6015(c)(2).

Petitioner testified that at the time he signed each return, he was unaware of his former spouse's participation in the parking lot scheme, and he was further unaware of any of the illegal income she received as a result. Petitioner's former

spouse testified that although petitioner did not know about her illegal activities, he was aware of the illegal income.  As between the two, we find petitioner's version of the events to be the more credible.  Other evidence supports our finding in this regard.

Petitioner's liability for each deficiency here in dispute is subject to his election under section 6015(c) for each year in issue.  Under the circumstances, we need not address petitioner's claim for relief under other provisions of section 6015.

To reflect the foregoing,

Decision will be entered

under Rule 155.